**UNEEDA DOLL CO., INC., Plaintiff,**

v.

**REGENT BABY PRODUCTS CORP.,**
**Defendant.**

**No. 71 C 379.**

United States District Court,
E. D. New York.

Nov. 14, 1972.

Bertram Frank, New York City (Kirschstein, Kirschstein, Ottinger & Frank, New York City, of counsel), for plaintiff.

Abraham Friedman, Brooklyn, N. Y. (Friedman & Goodman, Brooklyn, N. Y., of counsel), for defendant.

## MEMORANDUM INCORPORATING FINDINGS of FACT and ORDER

DOOLING, District Judge.

Plaintiff doll manufacturer has moved for a preliminary injunction in its suit permanently to enjoin the defendant distributor of "baby products" from infringing plaintiff's copyright on a certain rubber squeeze-toy doll as a work of art, or a model or design for a work of art, registered under 17 U.S.C. § 5(g), for the impounding pending suit and the ultimate destruction of the allegedly infringing articles and the means of making them, and for damages (17 U.S.C. § 101(a)–(d)). There is little dispute about the principal operative facts although there are challenges to questions of motive and, inevitably, to issues of resemblance between the doll of the copyright and the allegedly pirated doll. The present findings are not intended to foreclose further evidence that could result in their modification, but they are intended as findings for all purposes as contemplated by Rule 65(a)(2) and Rule 52(a), in the absence of additional evidence of moment later introduced. *Cf.* Lummus Co. v. Commonwealth Oil Refining Co., 2d Cir. 1961, 297 F.2d 80, 87–89.

Strictly, the doll of the copyright is the one marked as plaintiff's Exhibit A double prime at the hearing. See hearing Exhibit J and Leissner Deposition Exhibit 17. Robert Ostrander, a freelance artist who also had a regular contractual relationship with plaintiff, conceived the idea of the doll in 1965. He conceived it as a doll that would nearly approach a ball with an emphatically rotund body, with its legs and arms close to the body and folded around it in keeping with the concept of rotundity, and with the head smaller in relation to the body than he would otherwise have chosen had he not wished to emphasize rotundity. He prepared sketches and tried them on plaintiff without success. He returned to the subject in 1966 and in about that year prepared a clay model. Again the plaintiff failed to evince interest. Still later in 1966 Ostrander managed to get plaintiff to authorize a wax model. Finally, but not until 1967, did plaintiff show a genuine interest in making and marketing the doll. Ironically, it was an item on which, in this respect departing from usual custom, Ostrander received no royalty or special return; it was covered by what could loosely be called his retainer.

In advance of October 2, 1967, samples of the new doll were made up and under dates of September 6, 7 or 13, 1967, a boy and a baby model were sent to Jewel Tea, Inc., as samples; somewhere around September 18, 1967, three examples were sent to S. S. Kresge. The Kresge invoice identifies the samples as "Plumpees" and states that the Plumpees were shipped "WITH VOICE & C notice" (17 U.S.C. § 19). The C on the invoice is circled in simulation of the statutory copyright symbol. The invoice to Jewel Tea similarly identified the dolls as Plumpees. (Later, in connection with obtaining a trademark registration of the name Plumpee, plaintiff asserted that the trademark had been first used, and first used *in commerce*, on or about October 2, 1967. The trademark was applied for *ante litem motam*, in June 1968.) It appears that on or

about October 2, 1967, plaintiff ordered the manufacture of molds for making up the dolls on a production basis, and somewhere around January 2, 1968 further molds were ordered or the earlier order was modified or refined. The doll was shown in the plaintiff's "Doll Catalog 1968" with three illustrations identifiable, left to right as girl, boy and baby. The girl and baby dolls are identical except for color and hat. In the same illustration is shown the tag used on the doll; it corresponds to the tag exhibited in registering the Plumpee trademark. The doll as illustrated on the tag is not much like the doll itself. Plaintiff's Plumpee was originally manufactured in New York. It was about nine inches tall. See Exhibit J.

Plaintiff applied to register the doll under 17 U.S.C. § 5(g) on March 24, 1969, somewhat over a year after commercial sales commenced, and succeeded in registering the girl Plumpee. At the same time that plaintiff obtained the copyright registration on the girl doll it tried to register the boy doll separately, but the copyright office declined to register it on the ground that when the same motif is repeated in a set of works, and one of the set contains the fullest expression of the motif, only one registration is authorized or required. The copyright office stated that the two versions of the Plumpee doll were evidently made from the same mold, published on the same date, and were devoid of "copyrightable differences" (since colors are, assertedly, not copyrightable in statuary). The office registered the girl because it had more painting than the boy. Plaintiff protested the action but in vain, and it did not pursue the matter further.

The Plumpees in the nine inch form were introduced to the market in 1967–1968 and by a date early in 1968, approximating March 1968, plaintiff decided that it needed a smaller version of the doll from a cost and sales attractiveness viewpoint. Starting apparently at or before April 20, 1968, plaintiff arranged with Carlin Plastic Products Mfg. Co., Ltd. of Taipei, Taiwan, to make a reduction of the Plumpee doll. Carlin made up an initial rough sample earlier than May 29, 1968 and by August 15, 1968, the parties appear to have determined to go ahead with the manufacture of the small Plumpee. However, Carlin's production shipments from Taiwan did not start until the end of October or the first part of November in 1969; the formal order was placed September 23, 1969, and accepted October 18, 1969, for shipment not later than December 31, 1969. The long lapse between the determination to go ahead and the final production order was occupied with manufacturing detail. The new Plumpee, or "Baby Plumpee," is about six inches tall. While the nine inch Plumpee appears in plaintiff's "Dolls 1969" catalog, the six inch Baby Plumpee does not appear. The 1969 price list shows only a single Plumpee item, style No. 10,190 called "Plumpees Ass't.," listed as 24 pounds to the two dozen standard package, and costing $12.60 a dozen. The 1970 catalogue of plaintiff does show the six and a half inch Baby Plumpee as well as the nine inch Plumpee, and, if anything, the new catalogue could be said to "feature" the Baby Plumpee over the nine inch Plumpee.

The Baby Plumpee evidently from the very beginning has been marked around the neck line "Uneeda Doll Co. Inc./1968 Taiwan" and on the base is marked with the circled C of the statute and "Uneeda/Doll Co., Inc. MCMLXVIII/made in TAIWAN."

Apparently both dolls sold together; 440,000 of the nine inch doll, made in the United States, have been sold, and 576,000 of the small six inch doll, made in Taiwan, have also been sold in the United States. The gross sales value is not given, but it would apparently be somewhat under a million dollars. The advertising costs directly attributable to the promotion of the Plumpee and Baby Plumpee have been $50,000.

The first "infringing" doll which plaintiff observed in the American market was seen in late 1969 or early 1970. However, before that, but within the year 1969, plaintiff had seen the same doll in a department store in Japan. Plaintiff identifies it as also being the doll accused in the present case.

The allegedly infringing articles which plaintiff saw in Japan and in this country were small dolls close in size to the Baby Plumpee of plaintiff. Plaintiff applied for a copyright on Baby Plumpee under date of January 26, 1970, and gave as the date of publication August 15, 1969, but the application particularly drew to the attention of the copyright office that the date in the notice stamped on the doll was 1968. On or before March 2, 1970, plaintiff drew the attention of the Bureau of Customs of the Treasury Department to the allegedly infringing dolls which defendant was importing, and on March 2, 1970, the Bureau advised defendant that "it has been contended that these dolls infringe certain copyrights owned by the Uneeda Doll Company Inc.". The Bureau requested defendant to forward sample dolls to it.

Defendant does not manufacture, but it does distribute baby products including such dolls as the Baby Plumpee and the allegedly infringing dolls. The defendant describes its dolls as "squeeze-toys" which must not only attract a child but must be soft and yielding to the touch and beguiling in appearance. Defendant's principal is acquainted with Carlin of Taiwan, but at no time has it bought from Carlin any articles similar to the allegedly infringing articles, and defendant denies that any of its personnel had ever seen the dolls that Carlin made up for plaintiff until the controversy in suit arose. Defendant asserts too that it had never seen the nine inch Plumpee manufactured in this country by plaintiff. Defendant does not deny that in general it keeps in touch with the market, and in this Memorandum it is not intended to make any specific finding as to whether any responsible officer of defendant had seen either the Plumpee or the Baby Plumpee before defendant placed its first order for the dolls which allegedly infringe plaintiff's copyright.

The defendant first saw the allegedly infringing doll in Tokyo in September or October of 1968 at a toy show where they were shown by their producer Iwai. No definite finding as to the date when defendant placed his first order and received his first shipment can be made, but it is fairly inferable, and it is found, that the defendant's first market offering of the allegedly infringing dolls occurred and became known to plaintiff not later than March 2, 1970.

Iwai, a Japanese manufacturer, is the source of defendant's supply of the allegedly infringing dolls. The accused doll, Exhibit B annexed to the complaint, apparently was one of an assortment of different dolls (as illustrated in Hearing Exhibit I) which the defendant calls collectively "the grabbables." Defendant's dolls are made in two pieces; the head can be rotated on the body. Iwai supplied a second doll in the assortment with the same body as that of the allegedly infringing doll, but with a head having a different haircomb and wearing a large Dutchboy cap. Plaintiff's dolls are made in one piece, and the head cannot be moved with relation to the body.

The charge of infringement as presently advanced is leveled only against the doll an example of which was annexed as Exhibit B to the complaint in both the present suit and in an earlier suit, now dismissed, and another example of which is hearing Exhibit E. All the articles allegedly derived from Iwai are marked on the base "Iwai [in a circle] made in Japan / C 1968," and the letter C is circled in the statutory copyright designation form. The heads are also stamped at the neck "Made in Japan" with the Iwai name and symbol inserted in the line, typed between "in" and "Japan." On the present record there is no reason to question that the Iwai dolls do date from 1968; Japanese

trade association registrations of the two dolls were produced, one for the doll (without the Dutchboy hat) dated in July 1968 and the other, (with the Dutchboy hat) dated in September 1968.

There is no specific evidence that the two articles sell in the same channels of trade. Such evidence as there is indicates that the articles of the respective parties move in substantially the same channels of trade, and there is no question that the two six inch dolls appeal to the same ultimate consumers and presumably are marketed to them through essentially similar stores even if, as defendant implies, his squeeze toys would have been sold in a baby products department rather than in a toy or doll department of the same or another store. Continued publication of the defendant's squeeze toy necessarily satisfies a portion of the market that might otherwise have been satisfied by plaintiff's doll (subject to possible individual differences in "appeal"). The critical questions are the validity of plaintiff's copyright and infringement.

The issue of the validity of plaintiff's copyright has been pursued elaborately. The first copyright was valid when claimed and registered. The evidence is that plaintiff takes care to publish its new dolls with the copyright notice, and there is no basis to infer that it was not done in the present instance. The invoice to Kresge demonstrates adversion to the point at a date so very early as to exclude any inference of a failure to publish with notice. That act secured the copyright for the work (17 U.S.C. § 10), and, if inclusion of the date in the notice was required, a correct date was included in the notice along with the name of the person claiming the copyright. 17 U.S.C. § 19. A date was not required on the notice under the literal reading of Section 19, however, since the doll was a work of art, as Section 19 has been interpreted in Fleischer Studios, Inc. v. Ralph A. Freundlich, Inc., 2d Cir. 1934, 73 F.2d 276, 278 (opinion per Manton, C. J.).

It is argued that plaintiff has, as it were, forfeited its copyright, or at least lost the right to enforce it as against defendant and any others who may be similarly situated, by its later dealings with the copyright office. The argument emphasizes the original denial to plaintiff of a copyright on the boy Plumpee and plaintiff's later conduct in presenting what plaintiff knew was essentially the same statuary to the copyright office a second time dating it a year later on the doll and assigning a publication date two years later in the body of the copyright when it knew, or should have known, that it did not have additionally copyrightable subject matter, and, that if it did obtain a copyright registration, it would be abusing the copyright office and diminishing the public right by extending its monopoly for a year or more by the "false dating" on the doll and in the registration application. There is no evidence that plaintiff had an improper purpose in acting as it did, or of any prejudicial consequence flowing from its act except what, if anything, can be inferred from the facts already found. The filing appears to have been an attempt to register a copyright on the Taiwanese six inch doll for whatever copyrightable differences it presented when compared with the nine inch girl Plumpee. Plaintiff should also have referred to the earlier registration when it inserted the dating note, and should have explained the reasons for the new application for registration. But the critical point is that the copyright is on the article and is obtained by its publication with the name of the proprietor and the circled letter C. Republication of the same doll, if it is the same doll, with the circled C neither extends the copyright, nor is it of itself invalid, nor does it forfeit the earlier copyright. At worst, its post-dating might, speciously, seem to create an extended life for the copyright—comparable to what is seen as the evil in attempted double-patenting. But, in double-patenting, it appears that the second

patent is simply invalid and nothing more, working no forfeiture of the earlier patent; so here. *Cf.* Hope Basket Co. v. Product Advancement Corp., 6th Cir. 1951, 187 F.2d 1008, 1012. Although not with systematic sternness, some cases have recognized the principle that where a copyrighted article is postdated so as to seem t extend the copyright's life, the consequence can be forfeiture. See cases mentioned in Davis v. E. I. DuPont de Nemours & Co., S.D.N.Y.1965, 240 F.Supp. 612, 624, fn. 68. See Advisers, Inc. v. Wiesen-Hart, Inc., 6th Cir. 1956, 238 F.2d 706; First American Artificial Flowers, Inc. v. Jos. Markovits, Inc., S.D.N.Y.1972, 175 U.S. P.Q. 201. The present case differs from earlier cases in that at all times the large Plumpee was being sold with the copyright notice and the year 1967 on it, and that doll and its copyright furnished a sufficient basis for plaintiff's claims in the present case. If the "1967" Plumpee was misdated, and there is no indication that it was, it was misdated in the public's favor in stating too early a copyright date. If the nine inch Plumpee should have been dated later, it would certainly have been properly dated to 1968 and to the very first part of that year. In the absence of some specific prejudice to an identifiable interest resulting from the dating of the later six inch doll, it becomes simply an aberration that is without legal significance, and which present counsel for plaintiff have done their best to deal with by proffering a surrender of the second copyright registration to the copyright office.

Defendant is explicit in its evidence that it was in late 1968 that it first saw and placed an order for the Iwai dolls and that it was in early 1969 that the first shipment arrived. Plaintiff's evidence is that one of its representatives saw the Iwai doll in a department store in Japan some time—in the forepart apparently—of 1969, and first saw it in the United States late in 1969 or, possibly, early in 1970. Because of the slow progress of the Carlin operation in Tai-

wan plaintiff's six inch doll did not appear in the American market until the very end of 1969 or early 1970, and it was not registered until January 26, 1970. Hence, long before the production, importation and registration of the Baby Plumpee the defendant had already committed itself first to the purchase and then to the actual import and distribution of the Iwai doll; when it did so there was no Plumpee on the market except the nine inch Plumpee dated 1967, and no copyright registration in existence until plaintiff obtained Gp 61471 of March 24, 1969. Misreliance on defendant's part on a supposed misstatement as to date in the registration of the Baby Plumpee or on the 1968 dating on the Baby Plumpee itself is not a factor. It did not occur; it could not have occurred.

Nor does it appear in this case that the publications of the Baby Plumpees with the 1968 dating stamped on them could be regarded as publications so defectively marked that they can be treated as if not marked at all, and as thus effecting a dedication of the earlier copyrighted Plumpee to the public. *Cf.* Mifflin v. Dutton, 1903, 190 U.S. 265, 23 S.Ct. 771, 47 L.Ed. 1043. Bearing in mind that the work of art publications need not be dated (17 U.S.C. § 19), the complaint with respect to the notice would have to be simply that it had in fact mislead someone to his prejudice, or that it was intrinsically and dangerously likely to do so. On the facts, the defendant here has not been misled or prejudiced, and it is difficult to see how, in the face of the pre-existing publication of the Plumpee and its earlier registration, any intrinsic harm could flow from the particular defect, if such it be, in the notice dating. See First American Artificial Flowers, Inc., *supra.* If the earlier publication and registration had not existed, people might be prejudiced by withholding their publications of Baby Plumpees for an extra year because misled by the copyright dating on the article. But that cannot occur for another two decades or more, and it is

hardly relevant in the present case. The same situation seems to have existed in Thomas Wilson & Co. v. Irving J. Dorfman Co., 2d Cir. 1970, 433 F.2d 409, 412. In that case there was a suggestion of double copyrighting with the seeming risk of extending the copyright period; the Court discussed the issue in the context of particular prejudice to the defendant involved and declined the opportunity to visit "double copyrighting" with forfeiture of the earlier copyright.

Defendant argues that plaintiff delayed seeking judicial relief and injunctive relief for a long period and that it has failed to seek to protect its alleged copyright against other infringers. These two circumstances taken together and coupled with the alleged absence of irreparable damage, defendant suggests, warrant denying to the plaintiff the extraordinary relief of preliminary injunction.

Plaintiff delayed suit for over a year after it learned of defendant's importations. There is evidence that at least in 1971 if not earlier the "Chinese copies" of the Iwai doll with the Dutchboy hat appeared on the American market bearing indication of their manufacture in Hong Kong. It does not appear, however, that any of the Iwai dolls without the Dutchboy hat have made an appearance in this country from Hong Kong or elsewhere. At the present time, plaintiff has not pressed a claim of infringement with respect to the doll with the Dutchboy hat, but, as indicated above, has at this time limited its claim to the doll exemplified by Exhibit B annexed to the complaint.

 Defendant is right in drawing attention to so much of 17 U.S.C. § 112 as empowers the courts to grant injunctions to prevent and restrain violation of any rights secured by the title "according to the course and principles of courts of equity"; traditionally, if not always thoughtfully, courts of equity have insisted upon a showing of irreparable damage to support a preliminary injunction rather than upon a showing of

right to specific relief in the circumstances existing at the time of the application. But in the present case, as in other copyright infringement cases, the principal question is ordinarily whether the plaintiff has shown with distinctness a valid copyright and a case of infringement, for if these elements are shown, the probability of ultimate success on plaintiff's part becomes very high indeed, and other considerations applicable to the grant or denial of preliminary injunctions rapidly fall into place. The *status quo* then sought to be preserved is the state of non-infringement, of uninterrupted recognition of the copyright, and prevention of the escape into the market of articles which should be destroyed under the provisions of Section 101(d) and impounded during the action under the provisions of Section 101(c). The balancing of interests tips the scale in favor of a preliminary injunction: continued infringement not only erodes the plaintiff's statutory copyright but subjects the defendant to ever mounting damage and costs exposure, including exposure to the vindictive damages provided for in Section 101. Hence, in the copyright case great emphasis properly falls on probability of success, and that probability of ultimate success is fairly readily shown in the ordinary case. Hence, the frequent expression of the rule respecting preliminary injunctions in copyright cases in the somewhat special form that it has taken in the second circuit. See Rice v. American Program Bureau, 2d Cir. 1971, 446 F.2d 685, 688; American Metropolitan Enterprises, etc. v. Warner Bros. Records, Inc., 2d Cir. 1968, 389 F.2d 903, 904–905; Uneeda Doll Co. v. Goldfarb Novelty Co., 2d Cir. 1967, 373 F.2d 851, 852, fn. 1. Irreparable damage, in any event, is implicit in the nature of the wrong complained of. Damages in such a case as the present one are frequently very difficult to determine satisfactorily, and resort to the vindictive damages of Section 101(b) is undesirable and unsatisfactory. On the other hand, the preservation to the plaintiff of the market for the article of

its origination is the natural and correct measure of its remedial as of its substantive right, and to deny plaintiff the fruits of its statutory grant and give it instead the opportunity to get some kind of monetary damages is to furnish an inadequate substitute for what is a lawful entitlement.

■ Delay in applying for injunctive relief is not a decisive factor in determining whether or not the relief should be granted when the factor is tested against the principles that would govern the grant or denial of a prompt application for a preliminary injunction in copyright cases. Delay remits the plaintiff to a claim for damages for the period when no injunction was in effect, and no doubt delay in so applying should have a very real influence on the amount of damages awarded for each unit of infringement if the plaintiff ultimately prevails, but the delay appears to have no tendency to dissolve the right to the preliminary relief.

■ The effect of the infringement, if any, represented by the Hong Kong item is no different. If there is infringement, it can be pursued; the failure to pursue it promptly cannot give defendant a right to infringe, or the right to continue the infringement, if such it is, until a permanent injunction is granted at the end of the case.

■ The final issue is infringement. There is no evidence that the defendant itself is responsible for the initiation of whatever infringement there is. If its evidence is accepted as true, the defendant is an innocent purchaser of the item, and until given actual notice of the plaintiff's claim, it had only that legal notice of its own infringement which flowed from the publication by the plaintiff of every example of its doll with the required copyright notice. But defendant, if it is an infringer by virtue of its supplier's infringement, must of course submit to the plaintiff's right.

The description given by Robert Ostrander in his affidavit of May 3, 1971, of his doll and of its relation to the defendant's doll is a starting point for discussing infringement:

". . . both dolls depict a chubby baby in a sitting position. The sitting position of each doll further emphasizes its chubbiness. The stomach of each doll is exceedingly large to emphasize the chubbiness of the doll. Additionally, the stomach of the doll I created is substantially round which further emphasizes the chubbiness of the doll. I note that the stomach of defendant's doll is substantially round which emphasizes the chubbiness of its doll.

"The arms of the doll I created are relatively short with the forearms disproportionately large compared to the upper arms and the arms are relatively large in cross section and are an integral part of the doll torso to further create the impression of a round chubby doll. The arms of defendant's doll are relatively short with the forearms disproportionately large compared to the upper arms and relatively large in cross section and are an integral part of the doll torso to further create the impression of a round chubby doll. The wrists on both dolls are disproportionately large. Further, the left arm of plaintiff's doll is slightly bent while the right arm is relatively straight. On defendant's copy the left arm is slightly bent while the right arm is relatively straight.

"Plaintiff's doll is wearing a bolero [or Eton] jacket which is closed at the neck and open at the bottom which emphasizes the chubbiness of the doll. On the defendant's doll a bolero jacket is provided with the top of the jacket closed and the bottom open as on plaintiff's doll. On both dolls a [Peter Pan] collar is provided on the jacket which further emphasizes the similarity of the dolls.

"The left hand of plaintiff's doll is over the front upper left portion of the jacket. The right hand of plaintiff's doll is on the upper portion of the right side of the doll's stomach

and on the lower portion of the jacket. On the defendant's doll the left hand is over the front upper left portion of the jacket with the right hand on the upper portion of the right side of the doll's stomach on the lower part of the jacket.

"The legs on plaintiff's doll are disproportionately short to highlight the chubbiness of the doll and the knees of said legs are turned outwardly with the feet of the doll facing inwardly to follow the round ball appearance of the doll. On defendant's doll the legs are disproportionately short with the knees turned outwardly and the feet of the doll facing inwardly to follow the round ball appearance of the doll. On both plaintiff's and defendant's dolls shoes nearly identical in configuration are provided with the shoes on both dolls extending to the trunk of the doll.

"Both dolls have trousers with the top of the trouser spaced from the bottom portion of the jacket.

\* \* \* \* \* \*

"Plaintiff's doll does not have a defined neck which was purposely done in order to highlight the chubbiness of the doll. In the same fashion defendant's doll does not have a definite neck which emphasizes the chubbiness of defendant's doll."

The two dolls are by no means identical. If the two six inch dolls are placed side by side in profile, it is seen that the ratio of head to body size is much greater in defendant's doll than in plaintiff's. The face of plaintiff's doll is much flatter; defendant's doll's head is sharply indented at the space between the eyes, and the nose line is almost horizontal, the cheeks are protuberant and the eyes are relatively deeply sunk. Turned face toward the observer, it is seen that the two dolls have quite different hair arrangement. Plaintiff's doll produces the impression of a very high forehead on which the hair has been brushed forward and down in locks that curl in such a way as, in effect, to enclasp the head. On defendant's doll the hair is that of an older child, and it is swept away from a part at the side of the head in two waves, one of which, the longer wave, sweeps relatively low over the forehead.

There are differences in sculptural detail. The edge of the jacket of defendant's doll has a border defined by regularly spaced indentations which forms a hem and continues up the front opening of the jacket to the collar; the collar has a figure impressed at its edge between two parallel bordering lines; defendant's jacket has no buttons. Plaintiff's jacket has two conspicuous buttons embossed on the jacket front. The trousers on defendant's doll have a repeated fish figure incised in a pattern all around the trousers, and a waistline seam is defined by a chain of indentations. Plaintiff's trousers are plain. In the doll of the copyright, hearing Exhibit A double prime, the jacket is shown with a painted scalloped edging around the front opening and the bottom, but this is not a sculptural feature, and, in the copyright office view, was not matter of copyright protection.

Two important factors stand out. The first of these is that defendant's Iwai doll is not a mold copy of plaintiff's: that is, it is inferred that Iwai did not simply make a mold from plaintiff's doll and then use that to form its own dolls. On the contrary, every detail indicates that Iwai's doll maker worked from plaintiff's doll or with plaintiff's doll before him, and made the doll Iwai's own by modifying the plaintiff's doll. The second difference of moment is in the overall appearance of the doll. Partly because of the marked difference in head to body ratio, the sense of a distended figure is all but completely absent from defendant's doll. Robert Ostrander's testimony emphasized that the fatness, so successfully presented, is part of the very idea of plaintiff's doll. The face of defendant's doll is the conventional over open, over innocent smiling baby face, dear to doll makers, and, apparently, to doll buyers. Plaintiff's

doll-face is, especially as seen in the nine inch exemplar of the copyright, round and smiling, yet strange and puzzling. One doll would not be mistaken for the other, but that is not to say that a buyer might not be almost equally attracted by either one. It is evident that the most original elements in plaintiff's doll, those which give it its characteristic of difference from the common run of dolls, is what the defendant's Iwai doll maker tended to reject in favor of conventional pleasingness. To sum it up, the impression overall is that the Iwai doll maker took the plaintiff's doll, altered details of its dress, scaled up the head to body ratio, and used a different head, one of more conventionally pleasing sort. But the inference is inescapable that the Iwai doll maker saw plaintiff's doll and appropriated the ensemble of plaintiff's doll in making his own. Yet the ensemble rather than the individuality that Ostrander impressed on his doll may be, for all that appears, an important element in commercial, customer value and appeal.

How much of the ensemble was Ostrander's is not altogether clear. Defendant did not produce much in the way of earlier dolls which nearly approach the doll of plaintiff. The Mobley seated elephant of Exhibit F did indeed have a sort of Eton jacket open at the bottom, a gap between jacket and trousers and trousers simply bursting with seated elephant, the legs close to the body. But the arm position is very different and the big butterfly bowtie under the elephant's chin obscures the character of the inverted V opening of the plaintiff's jacket. The teddy bear of Exhibit G is too completely different to be suggestive.

The other dolls referred to—animal figures with little jackets in seated posture—are not closer to plaintiff's doll than is the elephant Exhibit F. As can be seen by leafing through plaintiff's three catalogues, seated dolls can readily be visualized in any number of designs with movable arms and legs. But defendant points to nothing which genuinely diminishes the extent of original combination in the idea and treatment of plaintiff's Plumpee, and in its novelty of facial expression. Defendant has failed to show any earlier use of plaintiff's assembly, its own combination in the whole of the body features of the Ostrander doll, the doll with arms positioned as his are, with legs folded as his are, with Eton jacket spread open as his is, with Peter Pan collar and with separation between vest and trousers. All these the defendant has taken. He has used the body ensemble in contour, and in components, and he has modified it mainly in surface elements, closing the Peter Pan collar at front, and incising the design on jacket, on collar and on trouser top. Defendant rejected the head and facial expression in favor of his own. But defendant's is a derived if "improved" doll, and, if it does itself have elements that might be entitled to independent copyright despite the doll of plaintiff, it is nevertheless a doll which has taken original features of plaintiff's doll and used them as elements of defendant's Iwai doll.

Plaintiff has not demonstrated access by defendant to plaintiff's article and in any case, as noted above, the important question is whether or not Iwai copied the doll. The only evidence to support that inference is the internal evidence of similarity, and the absence of any showing that the Iwai doll was first in point in time. It is not denied that Iwai had access to the nine inch Plumpee. It was on the market early in 1968 and was in the Uneeda catalogue of 1968.

Given then the conclusions of fact that defendant's doll was derived from plaintiff's and that defendant's Iwai doll maker used the body ensemble of the doll with clear cut modifications of detail and used a genuinely different head, is there infringement within the sense of the copyright cases? The line of cases carefully working toward delineating the criterion of infringement in this circuit returns repeatedly to Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 2d Cir. 1960, 274 F.2d 487. There, talking

in terms of works of art, the Court, despite differences in patterns of distribution of design figures and absence of identity in design elements, found infringement because the "ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their esthetic appeal as the same." The test seems severe. The two articles must be visually interchangeable unless the eye is arrested for scanning on the details of each, and the aesthetic impression must be the same. Millworth Converting Corp. v. Slifka, 2d Cir. 1960, 276 F.2d 443 emphasizes that, within the *Peter Pan* test, it is necessary for the plaintiff to show that what has been taken is that part of plaintiff's copyrighted work which was not itself drawn from the public domain, and that, where defendant's fabric differed markedly from plaintiff's in design, the use by the defendant of plaintiff's method of producing a three dimensional effect was not enough to constitute infringement since it at most was a pirating of the idea of three dimensionality rather than piracy of a finished three dimensional design. Later, in Ideal Toy Corp. v. Sayco Doll Corp., 2d Cir. 1962, 302 F.2d 623, the Court sustained a preliminary injunction in a doll case on a finding that the accused doll's head "incorporates so many distinctive features and characteristics of the head of plaintiff's doll as to lead to the conclusion *prima facie* that defendant's doll head was copied from plaintiff's." Judge Clark, dissenting, urged that the finding was of a "partial copying of only certain features, and not a total reproduction." After discussing the question of the effect of similarities found with differences, Judge Clark, on the authority of *Peter Pan,* said "it seems clear that such compartmentalizing of copyright is both impracticable and unreal and we must rather decide on the overall *identity* of the products" (italics added). Uneeda Doll Co. v. P & M Doll Co., 2d Cir. 1965, 353 F.2d 788, may be taken as again requiring something more nearly approaching "identity" than use of a startling and probably original and imaginative element in a display box for dolls.

However, in Ideal Toy Corp. v. Fab-Lu Ltd., 2d Cir. 1966, 360 F.2d 1021, a doll case, the Court treated as "well established" a test of "a substantial similarity" between the copyrighted work and the alleged copy to make out infringement. The Court said that the test of substantial similarity is "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." The Court, then, looking at the dolls themselves, observed that while they contained similarities in the standard doll features, distinct differences existed with respect to neck structure, hair style and, to a lesser extent, with respect to chin structure and overall craftmanship. Noting that the copyright owner particularly emphasized the doll's head as the feature giving it uniqueness and claimed that the defendant had improperly copied that design, the Court noted that the most evident difference between the dolls related to the head design, indicating that the alleged infringer had not appropriated whatever unique qualities the copyright owner's doll possessed. It will be noticed that "substantial similarity" is radically different—at least semantically—from "identity" and from indistinguishability, and yet the Court's approach in comparing the two dolls only mildly implies that "identity" would not have been required to demonstrate infringement. What is of additional note, however, is that the Court cited with approval Judge Clark's dissenting opinion in Ideal Toy v. Sayco Doll Corp., although only to quote language which did not embody the point of the dissent's criterion of infringement. In Concord Fabrics, Inc. v. Marcus Bros. Textile Corp., 2d Cir. 1969, 409 F.2d 1315, the Court reversed the denial of an injunction and ordered a preliminary injunction in a design copyright case involving textiles. The District Court had found the two fabrics not sufficiently similar to warrant injunction. On appeal the

Court found that the design in its geometrical features was identical, that its colors were essentially the same, although the defendant's were more garish, and that the design detail exhibited some differences but gave "the same general impression on both samples." The Court said of the minor differences in the two patterns that "the very nature of these differences only tends to emphasize the extent to which the defendant has deliberately copied from the plaintiff." The Court saw here indications of deliberate copying with changes introduced to avoid the appearance of infringement. The Court invoked the test of *Ideal Toy Corp. v. Fab-Lu Ltd.,* saying that, "the ultimate test . . . is whether an average lay observer would find a substantial similarity in the designs, recognizing the copy as an appropriation of the copyrighted work."

█ It will be seen here that the test of the more recent cases is greatly shifted from the *Peter Pan* view, which seemed to require something approaching "identity." If the test of non-infringement is difference, deliberate and calculated difference should produce non-infringement, unless, quite apart from conscious modification in order to avoid infringement, a finding of infringement requires something very much less than identical reproduction or the production of something that is practically indistinguishable in appearance and aesthetic effect. Yet *Puddu v. Buonamici Statuary, Inc.,* 2d Cir. 1971, 450 F.2d 401, 402, returns to the *Peter Pan* test and contrasts the test for the validity of copyright with the test for infringement, noting that originality sufficient for copyright protection exists if the author has introduced any element of novelty as compared with the materials previously known to him, whereas, if the issue is infringement, introduction of a similar element by a copier will not avoid liability for infringement if, in the language of the *Peter Pan* case, "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Couleur International Ltd. v. Opulent Fabrics, Inc.,* S.D.N.Y.1971, 330 F.Supp. 152, 153–154, found infringement where there was not an identity in pattern between two fabrics but the differences were calculated ones introduced to conceal infringement. The Court used a twofold test, the first that of the *Peter Pan* case—that the ordinary observer unless he set out to detect the disparities would be disposed to overlook them and regard the aesthetic appeal of the two articles as the same—and, second, the test of substantial copying.

It will be seen that the problem of infringement is not simple in the present case. A very literal application of the *Peter Pan* test would require a conclusion that there is no infringement here, because the aesthetic impression is not the same, and the difference in aesthetic impression is not accidental or the result of clumsy copying; it is, so far as one can judge from the comparison of the dolls, intentional and intended to improve the doll's sales appeal. Nor are the differences only such that an ordinary observer would be disposed to overlook them unless he set out to detect the disparities. The differences in the two dolls are plain enough and, as noted above, one would not be mistaken for the other. Yet observation of the two dolls together would convince an observer that one depends on the other, that one has drawn from the other, not merely unimportant features but the purposive combination of features that characterizes the body of the doll and comprises a considerable part of its character and appeal. It would be possible perhaps, in the language of the *Peter Pan* case, to say that the two dolls share no more than the idea of having a round bodied doll that nearly approaches spherical rotundity and has its arms and legs close molded to the body. But when that much has been said it remains that the particular expression, the specific treatment of that idea, has been copied. Here unless the "idea" is defined with such refinement that it finally states the

whole "expression" or "treatment" as well, the present case is one in which not only has the idea of a roly poly doll been taken but the mode of expression has been closely copied in its primary characteristics. The copier has not been slavish, but, if anything, a studious improver who has discarded one of the most conspicuously original features of plaintiff's doll, the head. Nevertheless, the Iwai doll maker is an infringer although he has not copied the whole, has not copied it slavishly and has not sought by his differences to disguise or hide the fact of copying. The fact of copying is plain.

Judge Hough once said that the copyright statute "like all statutes, is made for plain people; and that copying which is infringement must be something 'which ordinary observation would cause to be recognized as having been taken from' the work of another." Dymow v. Bolton, 2d Cir. 1926, 11 F.2d 690, 692, quoting from King Syndicate v. Fleischer, 2d Cir. 1924, 199 F. 533, 535. So in the present case the appropriation is plain, and its boundaries are plain. It is real and substantial although not entire, and, although not of self-determining sales and damage significance. See, in addition to the cases discussed above, Nutt v. National Institute etc., 2d Cir. 1929, 31 F.2d 236, 239 (Judge Manton's phrase touches the idea: ". . . it is not the subject that is protected by copyright. It is the *treatment* of a subject that is protected." (Italics added.); Nichols v. Universal Pictures Corp., 2d Cir. 1930, 45 F.2d 119, 121 (". . . the less developed the characters, the less they can be copyrighted"); Comptone Co. Ltd. v. Rayex Corp., 2d Cir. 1958, 251 F.2d 487 (concluding, of a display card, that the "substantial similarity in the effect obtained from the shape of the card, the legends, the price sign, and the use of the Eiffel Tower in a somewhat similar treatment, [were] sufficient to sustain the [lower] court's Finding . . . of infringement. The copying need not be of every detail so long as

the copy is substantially similar to the copyrighted work." Citing *Nutt, supra,* with approval); Life Music, Inc. v. Wonderland Music Co., S.D.N.Y.1965, 241 F.Supp. 653, 655 (quoting from *Nutt, supra,* the test as being "whether the one charged with the infringement has made an independent production, or made a substantial and unfair use of the complainant's work.")

Plaintiff is accordingly entitled to a preliminary injunction. Consideration must be given to the amount of bond to be furnished, whether any existing dolls should be impounded pending the completion of the lawsuit, and what if anything the parties expect to do in the way of determining damages or lost profits for the past infringement. It should be noted that in view of the substantial differences between the two dolls, notwithstanding that one infringes the other, the damage and profits questions are not simple. It is accordingly

Ordered that the parties settle on five days' notice a form of injunction order and submit their suggestions with respect to the amount of security.