**SAMET & WELLS, INC., Plaintiff,**

v.

**SHALOM TOY CO., INC. and Martin Weber, Defendants.**

No. 74 C 695.

United States District Court,
E. D. New York.

April 1, 1977.

Kirschstein, Kirschstein, Ottinger & Frank, P. C., New York City, for plaintiff by Bertram Frank, Peter T. Cobrin, New York City.

Bernard Jay Coven, P. C., New York City, for defendants by Bernard Jay Coven, Stanford A. Chalson, New York City.

MEMORANDUM OF DECISION

NEAHER, District Judge.

Plaintiff Samet & Wells, Inc. ("Samet & Wells") brought this action for infringement of its copyright on a stuffed toy turtle against Shalom Toy Co., Inc. ("Shalom") and its president Martin Weber, seeking an injunction against continued infringement, damages and an accounting for profits resulting from the alleged infringement.[1] Defendants counterclaimed for a declaratory judgment regarding the validity of plaintiff's copyright.[2]

Following the issuance of a temporary restraining order on consent against defendants selling stuffed turtles with the same fabric as plaintiff's turtle, the late Judge Judd of this court, to whom the case was assigned, referred the matter to the United States Magistrate, as Special Master, to hold hearings and report on the question of Samet & Wells' title to the copyright.[3] The Magistrate's report, filed December 27, 1974, found that Samet & Wells did have all right, title and interest in the design for the turtle, including the right to copyright.

On February 24, 1975 the district court confirmed the report and issued a preliminary injunction against defendants manufacturing, advertising, publishing, copying or vending any stuffed turtles, which had been submitted as exhibits at the hearing before the Magistrate, in infringement of plaintiff's copyright.[4]

The trial on the merits was conducted before Judge Judd on January 30, 1976, February 6 and 12, 1976.[5] Judge Judd having died before the case was decided, it was assigned to the writer. The parties commendably waived their right to retrial and stipulated that a decision may be rendered based on the papers, transcripts, depositions and briefs already filed with the court.[6] The following constitute the court's findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

## Background Facts

Samet & Wells, holder of copyright No. Gp 82374, in controversy here, is a New York manufacturer and distributor of stuffed toys. Shalom likewise manufactures and sells stuffed toys and has never copyrighted any item. Both companies have the fabric portions of their stuffed toys, the "skins", mass produced in the Orient and then have the skins stuffed and sewn in their factories in New York. Both companies sell to retailers, stores, wholesalers and carnival jobbers. Sales are made directly by salesmen in the companies, distribution of catalogues showing the company's entire line, advertisements in trade magazines and displays at the annual Toy Fair in New York, and indirectly through sales representatives. One such sales representative, Mel Posin, served both companies; he represented Samet & Wells from 1962 until August 31, 1973, and Shalom beginning in 1971 and continuing to the present.

## Samet & Wells' Waddle Turtle

In January 1971 Posin introduced Milton Wells, president of Samet & Wells, to a

---

1. Jurisdiction is grounded on 28 U.S.C. § 1338.

2. A third-party complaint against David Dean has never been served.

3. All references to pages in the transcript of the hearing before the Magistrate are cited as "Hg Tr. ___".

4. A motion by defendants to further modify the preliminary injunction to exclude

   "a turtle which a paisley back, single color somewhat sculptured mouth, colored single central nostril, lidded eye, straight round tail and a green color"

was apparently never decided. The motion is now decided by excluding from the scope of the permanent injunction the turtle design depicted at page 11 of the so-called "Ka-Klar 1968 Catalog" in colors and fabric patterns other than those of plaintiff's turtles.

5. All references to the trial transcript are cited as follows: January 30, 1976 volume, "Tr. 1: ___"; February 6, 1976 volume, "Tr. 2: ___"; February 12, 1976 volume, "Tr. 3: ___".

6. Pursuant to Rule 65(a)(2), F.R.Civ.P., the evidence received upon the application for the preliminary injunction has been considered as part of the record.

freelance designer, David Dean, to arrange for the design of a stuffed cloth toy, a ballerina doll. Hg Tr. 22, 26. Dean completed the design of the ballerina in March 1971. Hg Tr. 27. The doll was added to Samet & Wells' line, was a successful item and was copyrighted jointly by Posin and Samet & Wells. Tr. 2:10.

Wells, satisfied with Dean's creation, next arranged for Dean to design for Samet & Wells a line of stuffed cloth animals, including a stuffed turtle. Wells verbally agreed to purchase from Dean such designs as he found acceptable. Hg Tr. 18–19. Dean spent some time at Wells' factory, consulting, sewing and changing the designs. Hg Tr. 78. In March and April 1971 designs of several animals (zebra, leopard, tiger, alligator and rabbit) were given to Samet & Wells, and some of these (zebra, leopard and tiger) were later copyrighted. Dean delivered samples of a stuffed turtle to Samet & Wells sometime before May 10, 1971, as indicated by his invoice of that date charging for a design pattern and three samples. PX–5.

The so-named "waddle turtle," described hereafter, was about 14″ in length. Samet & Wells promptly paid Dean for his work. PX–6.[7] Wells testified he immediately recognized the turtle design as a "winner," Hg Tr. 79, and proceeded to have additional designs and samples, and finally a large (24″) version of the turtle made by Dean. These were delivered to Samet & Wells on or about June 15, June 19, August 18 and August 23, 1971. PX–7, 9, 11, 13. Dean's invoices for them were promptly paid. PX–8, 10, 12, 14.[8]

Wells testified that he needed between four and six sample turtles before having them mass produced. Tr. 1:39. Since the faces had to be handpainted, the turtles required Dean's personal touch. Hg Tr. 42. Wells intended to use the samples for display at the office showroom, for demonstration on sales trips, for display by his sales representative and for copyright purposes. Hg Tr. 41. At the hearing and at trial, Wells produced a brown paper wrapper containing several fabric pieces which, he testified, had been delivered by Dean on August 23, 1971, Hg Tr. 49, Tr. 1:15, and on which was a handwritten notation regarding the purpose of the enclosures, including the words "1 showroom, 1 sales, 2 copyright". PX–15. Wells identified the writing as Dean's. Hg Tr. 50.

Plaintiff relies upon this writing to support its position that Dean intended Samet & Wells to have the right to copyright the turtle. Shalom has attempted to undercut this evidence by pointing out the fortuitous coincidence of Wells saving that particular wrapper. It must be noted, however, that defendants did not controvert the identification of Dean's handwriting with any evidence and, indeed, a comparison of the wrapper with admittedly authentic invoices in Dean's handwriting would compel the conclusion that Dean wrote the notation on the wrapper. The August 23, 1971 invoice corroborates Wells' testimony as it indicates delivery of two complete sample turtles and two laid out and cut turtle designs. PX–13. Dean completed all design work and samples of the turtle for Samet & Wells in August 1971. Hg Tr. 54.

Wells then proceeded to have the samples reproduced. In November or December 1971 he sent the patterns to his manufacturer in Taiwan to have 1,000 dozen turtle skins made. Tr. 1:20. The order had been given by December 24, 1971, as shown by a letter of credit drawn on Chase Manhattan Bank. PX–22. All 1,000 dozen turtles were to be shipped by boat except for two

---

7. The total amount of the invoice and check was $312.35, itemized as $200 for a design pattern and original sample, $50 each for a sales sample and a sample for manufacturer in Taiwan, and $12.35 for fabric.

8. Wells paid $250 for a large version on June 15, 1971, $70 each for three additional large samples on June 21, 1971, $12.58 for fabric on August 20, 1971 and $70 each for two samples and $30 each for two fabric layouts on August 24, 1971. The checks were for larger total amounts, as they included designs of other animals.

dozen shipped by air for Wells' inspection and approval.

Early in January 1972, Wells began to display the waddle turtle in his showroom, Tr. 1:29, and gave a sample to Posin for display by the sales representative. Tr. 1:23. Later in the month, Wells had printed a four-page insert to his catalogue which included pictures of the large and small versions of the turtle. PX–24B. At that time he began to use model numbers "638" for the small turtle and "653" for the large one. Tr. 1:84. The turtles were displayed at the February 1972 Toy Fair by both Wells and Posin.

Finally, Wells made two sales trips in January 1972 in which he offered the turtles for sale and obtained orders for the toy. The first trip, to Philadelphia, occurred about January 20, 1972, Tr. 1:90, 2:6, and resulted in the sale of 12 dozen turtles to one customer. PX–23. The second began about January 30, 1972, lasted about two weeks, and resulted in more orders from customers. Tr. 1:25.

All turtles displayed, offered for sale or sold by Samet & Wells have exhibited a notice of copyright in proper form.[9] See Tr. 1:26.

Samet & Wells did not register the copyright on the turtle until December 29, 1972. The "waddle turtle" was registered as a novelty doll, a work of art, 17 U.S.C. § 5(g), and received registration number Gp 82374. PX–1. January 18, 1972 was listed as the date of first publication, which coincides generally with sales made by Wells on his January sales trip. The turtle has been a profitable addition to Samet & Wells' line, with sales of approximately 750,000 turtles between 1972 and 1976. Tr. 1:30. In 1972 and 1973 alone, sales grossed between $400,-000 and $500,000.

*Shalom's Turtle*

The testimony regarding the creation of the turtle design for Shalom and Shalom's first sale is somewhat contradictory. In general, Shalom contends that Dean designed the turtle for Shalom in 1971 and that Shalom first sold the turtle in December 1971, before Samet & Wells' claimed date of publication, January 1972.

Specifically, Weber testified at the hearing before the Magistrate that he met Dean in Posin's showroom in January 1971 and requested Dean to design a few items (bear, cat, tiger, fish and turtle). Hg Tr. 195, 202. In March 1971, he set up an appointment with Dean at Shalom's factory and gave him some samples of the Shalom line. Hg Tr. 203. Weber stated that in August 1971 Dean gave him some items which were unacceptable and that he told Dean to return later with corrected samples. Hg Tr. 204–05. That November Dean presented some finished pieces which Weber again did not accept, this time because the whole order had not been completed. Hg Tr. 205.

Not until December 1, 1971, according to Weber's own testimony at the hearing, did Dean deliver all the samples and patterns, including the turtle. Hg Tr. 207. He presented an invoice for $1,000, and after some discussion of the amount, Weber paid a revised sum of $750 for the designs. Hg Tr. 217–18. Weber also testified that the invoice had a notation from Dean giving Shalom "exclusive rights" to the design. Weber, however, could not produce the invoice at the hearing because it had been lost. Hg Tr. 218.

The Magistrate did not find Weber's testimony credible regarding the January meeting and conversation. Defendants adduced no testimony at trial on the question of when Dean sold the turtle design and samples to Shalom to overcome the Magistrate's finding.[10]

---

**9.** The copyright notice, PX–3, reads:

   "A SAMET & WELLS, INC. PRODUCT
   BODY MADE IN TAIWAN
   © 1972 SAMET & WELLS, INC.
   BRONX, N.Y. 10460"

**10.** Defendants simply argue without proof that Dean sold the design on December 1, 1971. Defendants' Post-Trial Brief, pp. 1–2, 9.

Weber did testify at trial that, in December 1971,[11] Shalom sold 12 turtle samples to Ace Toy Company. Tr. 2:87, 3:13. Howard Menzin, president of Ace Toy, appeared and produced a copy of that invoice. The invoice is dated December 15, 1971 and lists a "12 pc 661 Turtle Sample" for $7.20. DX–F. This was the sole sale of a Shalom turtle for almost two years.[12] In October 1973, Shalom ordered a large quantity—700 dozen of 24″ turtles—from the Orient, to be shipped for stuffing in the United States. PX–35. The turtles were received and began to be shipped to customers in November 1973, as indicated by a sheaf of invoices.[13] PX–32, 34. The turtles were sold through Success Toy Company, formed in 1973 as an unincorporated "subsidiary" of Shalom. Tr. 2:92–93. Weber started to use model number "653" for the large turtle at this time. According to Weber, the number was chosen at random and without knowledge that Samet & Wells also used "653" for its turtle's model number. Tr. 3:26.

None of Shalom's turtles ever contained a notice of copyright.

Samet & Wells' attorneys sent Shalom notices of infringement on March 12 and April 29, 1974, demanding that Shalom cease and desist from selling and offering for sale infringing copies of its turtle. PX 28–29. Weber testified he had never seen plaintiff's turtle before receiving the notice of infringement. Tr. 2:56. He also testified he was unfamiliar with his competitors' lines and never tried to learn what his competitors were selling. Tr. 2:83–84. Weber also admitted that he disregarded the notices of infringement. Tr. 2:54, 55. This action soon followed the second notice of infringement.

### Infringement

■ In order to sustain its claim of copyright infringement Samet & Wells is re-quired to demonstrate (1) copying by Shalom and (2) ownership of the copyright. The first element depends on establishing substantial similarity between the copyrighted turtle and the accused work and access or non-independent creation by Shalom. See Nimmer, Copyright § 141.

### 1. Resemblance

■ Resemblance here is apparent. The turtle for which Samet & Wells holds a copyright and the turtle which Shalom manufactured prior to the temporary restraining order and preliminary injunction are identical in design, save for minor variances. The copyrighted "waddle turtle," a cotton cloth stuffed toy, has a yellow body and legs, a printed "shell" back with brightly-colored flower and circular patterns set in squares, a pink curled-up tail, pink "tam-o-shanter" hat and gold collar. The most distinctive feature is the face, a painted (or screen printed) cartoon-like design with wide eyes, eyebrows and eyelashes, pink nostrils and smiling mouth. PX–3, 4.

The Shalom turtle subject to the restraining order is the same as the copyrighted turtle except for slightly darker eyes and a green hat. PX–16. The other Shalom turtles in evidence are substantially similar. A small turtle has a slightly different hat, flowered back and ribbon collar. PX–18. Another small one has a plain back and the facial features slightly changed, i.e., teeth and no eyelashes. PX–17. Three large versions have a concentric circle back design and gathered polka dot hat. PX–19, 20, 21. One of this last group has a green colored body. PX–21. These Shalom turtles are all subject to the preliminary injunction.

In granting the preliminary injunction, Judge Judd found that

"even in the light of the prior art made known at the hearing on the motion for

---

**11.** At the hearing Weber specified the date of sale as December 15, 1971. Hg Tr. 231.

**12.** Weber testified he ordered and then cancelled an order of turtles from the Orient early in 1972. Tr. 3:15–16.

**13.** Pursuant to plaintiff's demand, defendants produced all of Shalom's invoices with turtles. The earliest invoice bears a November 1973 date. PX–34.

preliminary injunction, the differences between plaintiff's copyrighted version and defendants' versions are not sufficiently significant to make the average layman believe that the turtles came from different manufacturers." [14]

At trial defendants did not contest that finding or raise anew the issue of resemblance between Samet & Wells' and Shalom's turtles. Were they to do so, the same conclusion would have to be drawn that "an average lay observer would find a substantial similarity in the design recognizing the copy as an appropriation of the copyrighted work." *Concord Fabrics, Inc. v. Marcus Brothers Textile Corp.*, 409 F.2d 1315, 1316 (2 Cir. 1969). Accord, *Soptra Fabrics Corp. v. Stafford Knitting Mills, Inc.*, 490 F.2d 1092 (2 Cir. 1974).

## 2. Access

Indeed defendants now agree that Dean sold the *same* turtle design to both Shalom and plaintiff. Not being able to attack successfully the claim of resemblance, defendants assert that plaintiff, in order to prove that Shalom had access to the design, must show that Shalom actually copied from a Samet & Wells turtle. Their argument is simply an erroneous statement of the law, where, as here, the same designer created the design for one toy manufacturer and then proceeded to also sell it to a second. See *DeAcosta v. Brown*, 146 F.2d 408, 410 (2 Cir. 1944). Nimmer, Copyright § 142.1.

Again, defendants submit nothing to overcome the adverse decision on the preliminary injunction. There Judge Judd stated:

"Copyright may not protect against independent invention of the same design, but that is not the case here. As Judge Dooling said in *Uneeda Doll Co., Inc. v. Regent Baby Products Corp.*, 355 F.Supp. 438, 446 (E.D.N.Y.1972):

'[D]efendant, if it is an infringer by virtue of its supplier's infringement,

must of course submit to the plaintiff's right.' " [15]

Plaintiff has fairly proved the element of copying. Unlike many copyright actions, the issues in this case are not whether plaintiff's and defendants' turtles are substantially similar in design or whether defendants independently created their own stuffed turtle. Rather the heart of this case concerns the validity of plaintiff's copyright on the turtle. To the issues involved in that determination we now turn.

### Validity of the Copyright

The Certificate of Registration of the copyright plaintiff holds on the turtle, No. Gp 82374, filed by Samet & Wells on December 29, 1972, is *prima facie* evidence of the facts contained therein. 17 U.S.C. § 209. *Herbert Rosenthal Jewelry Corp. v. Grossbardt*, 428 F.2d 551, 553 (2 Cir. 1970). The burden thus shifted to defendants to prove invalidity of the copyright. Nimmer, Copyright § 139. Defendants mount a two prong attack on the statutory copyright arguing first, that Samet & Wells was not the author of the work, and second, in any event Shalom published its turtle first. Their assault fails.

## 1. Authorship

Plaintiff's Certificate of Registration lists Samet & Wells, Inc. as both claimant of the copyright and author of the work. Shalom contends that David Dean was the true author and that Samet & Wells has failed to show that it had acquired the right to copyright from Dean. The facts here, however, support the conclusion that plaintiff itself was the author of the work, and therefore the rightful owner of the copyright.

By statute, an author, for copyright purposes, is defined to include "an employer in the case of works made for hire." 17 U.S.C. § 26. Absent an express contractual reservation of copyright in an artist, title to the copyright is presumed to be in the em-

---

**14.** *Memorandum and Order*, dated February 24, 1975, p. 17.

**15.** *Id.*, p. 18.

ployer, the person at whose instance and expense the work is done. *Scherr v. Universal Match Corp.*, 417 F.2d 497, 500 (2 Cir. 1969); *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565 (2 Cir. 1966); *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298 (9 Cir. 1965). Dean's freelance status does not defeat the application of the work for hire doctrine. The doctrine applies equally as well to an independent contractor as it would to a salaried member of Samet & Wells' staff. *Brattleboro Publishing Co. v. Winmill Publishing Corp., supra*, 369 F.2d at 568. Accord, *Herbert Rosenthal Jewelry Corp. v. Grossbardt, supra*, 428 F.2d at 554. Defendants have submitted no evidence to overcome this presumption or to negate the intent of the parties, as disclosed by the evidence, that title to the copyright should vest in Samet & Wells.

Regarding the intent of the parties as to the parameters of their relationship, the evidence is uncontroverted that Wells employed Dean to create the designs for a line of stuffed animals in March 1971, that Dean delivered a turtle design to Wells by May 10, 1971, that Wells accepted and paid for that design, that Dean fashioned samples and a large version of the turtle and that Wells also accepted and paid for them. Wells testified that he understood he possessed all right and title to the design, including the right to copyright, Hg Tr. 17–19, and this testimony is corroborated by the brown paper wrapper delivered by Dean on August 23, 1971, PX–15, indicating two of the enclosed samples were for copyright purposes.

Dean's course of dealing with Samet & Wells supports the same inference. Dean's first design for plaintiff, the ballerina doll, was copyrighted jointly by plaintiff and its sales representative. Dean's next offering, the animal line, included not only the turtle, but a zebra, leopard, tiger, alligator and rabbit, some of which Samet & Wells also

copyrighted. During the spring of 1971, Dean worked at Samet & Wells' factory, consulting, sewing and altering the patterns on all the designs. Hg Tr. 78.

Moreover, testimony at the hearing on the practice in the industry bears out Samet & Wells' title to the turtle. A competitor, Arthur Ravitz of R & R Toy Company, testified that when purchasing designs for toys he expected to receive complete ownership of the design, exclusive rights, including the right to copyright. Hg Tr. 310–13. Defendant Weber himself testified that his December 1, 1971 invoice from Dean was marked "exclusive rights" and that the regular practice was to receive the exclusive rights to a design. Hg Tr. 242–44.

In fact, defendants can defeat Samet & Wells' claim of authorship only by proving that Shalom acquired rights to the turtle design before Samet & Wells received, accepted and paid for Dean's design about May 10, 1971 or at the latest, when all dealings with Dean were completed on August 23, 1971. No evidence points to such a showing. As stated above, the Magistrate found Weber's testimony on the January 1971 meeting with Dean incredible. Even assuming the January meeting did occur, that event was a mere preliminary to any binding agreement. By Weber's own testimony, Shalom did not accept or pay for any designs from Dean until December 1, 1971, and at that late date, the arrangement was so unsettled that the amount to be paid for the designs had not been agreed upon. By December 1, of course, Samet & Wells had concluded its dealings with Dean and had begun production of the turtle.

The foregoing facts lead inexorably to the conclusion that Dean designed the turtle at the instance and direction of Samet & Wells, that the work for hire doctrine applies, that Samet & Wells was the author of the work, and therefore that Samet & Wells had the right to claim authorship of the turtle.[16]

---

16. The conclusion that Samet & Wells is author also disposes of defendants' second argument that plaintiff was merely an assignee whose rights were cut off by Dean's subsequent assignment to Shalom. Even if Samet & Wells were an assignee of the unpublished work, it would have been entitled, as "proprietor," to register the copyright in its own name as claimant. 17 U.S.C. § 9.

## 2. *Publication*

Defendants' final argument is that Shalom published the turtle first, without a copyright, and therefore dedicated the turtle to the public, depriving the turtle of the ability to be copyrighted by anyone. The evidence adduced by defendants on its claim of publication is the following. Weber testified that the first sale of Shalom's Dean-designed turtle occurred on December 15, 1971 to Ace Toy Company. Weber testified that samples had been screen printed by a local printer. Howard Menzin of Ace Toy Co. produced his copy of an invoice, bearing the date December 15, 1971, reflecting the sale by Shalom of a "12 pc 661 Turtle Sample" in the amount of $7.20. He could not remember the turtle which the invoice demonstrated he purchased.

This evidence apparently was intended to refute the Magistrate's finding that Shalom first sold turtles in 1972, after plaintiff's initial publication, and Judge Judd's finding that it was unreasonable to believe that production could have been underway within two weeks of Shalom's receipt of the original design from Dean or that Shalom could already have received the turtle skins from its supplier in the Orient, as the labels on the turtles showed the body to have been made in Hong Kong.[17] The invoice is unclear as to what the purpose of the sale was and it remains highly improbable that the December 15, 1971 transaction was a sale of a finished stuffed turtle—especially when the next sale did not take place until almost two years later. Such a finding, however, need not be made.

█ As author of the unpublished work since May 1971, or at the very latest August 1971, Samet & Wells possessed a common law copyright in the turtle, that is, the right of first publication. The owner of a common law copyright is protected against appropriation without his consent before he publishes the work. *Trustees v. Greenough*, 105 U.S. 527, 530, 26 L.Ed. 1157 (1881); *Werckmeister v. American Litho-*

graphic Co., 134 F. 321 (2 Cir. 1904). Consequently, any sale by Shalom in December 1971 not authorized by Samet & Wells could not destroy Samet & Wells' right to publish the turtle first. Moreover, as the sale was not authorized, it constituted an infringement of plaintiff's common law copyright.

It follows then that plaintiff was the author of the work, possessed a common law copyright, that is, the right of first publication, and obtained a statutory copyright on the turtle when it published in 1972 with notice of copyright. Plaintiff's copyright therefore is valid and infringed by defendants' sales.

### Weber's Liability

The evidence adduced at trial made clear that Weber, Shalom's president, exercises complete control over the management of Shalom, with his wife, and they are the sole stockholders and officers of the corporation. He, with his wife, personally makes all decisions concerning what Shalom will produce. In 1971, Weber decided to have the turtle made, purchased the design from Dean, had samples made, ordered a volume of turtles in 1973 and sold them and continued to sell the turtles after receipt of the notices of infringement.

Weber testified that he was not interested in finding out what items his competitors sold and that he made no effort to familiarize himself with their lines. He further testified that, although he made some visits to customers, he had never seen the Samet & Wells turtle displayed. Weber stated that the first time he saw the Samet & Wells turtle was after receiving the notices of infringement in 1974. He also stated that he disregarded the notices because Samet & Wells had sent him other notices of infringement concerning items not in fact copyrighted.

█ The evidence leaves no doubt that Weber authorized and supervised production and marketing of Shalom's turtle. An individual, including an officer or director

**17.** *Memorandum and Order, supra* n. 14, at pp. 9–10.

of a corporation, who participates in the acts constituting infringement is personally liable, jointly and severally with the corporate defendant. *Kolbe v. Shaff*, 240 F.Supp. 588, 589–90 (S.D.N.Y.1965). Accord, *L & L White Metal Casting Corp. v. Cornell Metal Specialties Corp.*, 353 F.Supp. 1170, 1175 (E.D.N.Y.1972); *Morser v. Bengor Products Co.*, 283 F.Supp. 926, 928 (S.D. N.Y.1968). Weber's corporate office does not cloak him with immunity. *Pickwick Music Corp. v. Record Productions, Inc.*, 292 F.Supp. 39, 41 (S.D.N.Y.1968); *Morser v. Bengor Products Co., supra.* See *Federal Trade Commission v. Standard Education Society*, 86 F.2d 692, 695 (2 Cir. 1936). Nor is it necessary to pierce the corporate veil before imposing personal liability. *Kolbe v. Shaff, supra.*

■■■■ Accepting Weber's testimony that he had no knowledge of Samet & Wells' turtle until his receipt of the notice of infringement does not alter the question of Weber's liability. An intent to infringe or knowledge of infringement is not necessary in determining liability. An innocent infringer is likewise liable. *Morser v. Bengor Products Co., supra*, 283 F.Supp. at 928. When Weber disregarded the notices, he continued to sell the turtles at his peril. Therefore, the court concludes that Martin Weber is personally liable, jointly and severally, with Shalom Toy Company to Samet & Wells.

## Injunctive Relief

■■■■ Plaintiff having sustained its claim of copyright infringement and the copyright being clearly valid, Samet & Wells is entitled to entry of a permanent injunction continuing the preliminary injunction against defendants' infringement of its copyright No. Gp 82374, with the additional modification set forth in note 4, *supra.* 17 U.S.C. § 101(a).

Accordingly, defendants are permanently enjoined from manufacturing, advertising, publishing, copying or vending any stuffed turtles which infringe plaintiff's copyright No. Gp 82374.

## Damages

The question of damages, which was reserved for future determination, is referred to the United States Magistrate, as Special Master, to hear and report on the computation of damages attributable to infringement of plaintiff's copyright within 60 days. Rule 53(b), F.R.Civ.P.

## Attorney's Fee

■■■■ The court has also determined, in its discretion, that plaintiff should be allowed recovery of a reasonable attorney's fee, as provided in 17 U.S.C. § 116. Defendants, with actual knowledge of plaintiff's claim of copyright upon receipt of the notices of infringement, admitted disregarding the notice. Prior to that, the facts, viewing them in the light most favorable to defendants, indicate that Weber closed his eyes to the conduct of his competitors, specifically the considerable sales by plaintiff of its turtles. Moreover, the issue of Samet & Wells' ownership of the copyright has been litigated in this action three times, at the hearing before the Magistrate, on papers before Judge Judd, and at the trial on the merits, without defendants having presented substantial factual claims and persuasive legal arguments.

The Magistrate is therefore also directed to hear and report on the amount of a reasonable attorney's fee to be awarded Samet & Wells as part of its costs.

Settle interlocutory judgment on notice within 10 days in accordance with this opinion.

SO ORDERED.