**ORTH–O–VISION, INC., Plaintiff,**

**v.**

**HOME BOX OFFICE, Time Inc. and Morris Tarshis, Defendants.**

**No. 77 Civ. 3053.**

United States District Court, S. D. New York.

June 27, 1979.

**24.** *Belsky v. Lowenthal,* 62 A.D.2d 319, 405 N.Y.S.2d 62, 65 (1st Dep't), *leave to appeal* *denied,* 45 N.Y.2d 945, 411 N.Y.S.2d 563, 383 N.E.2d 156 (1978).

674

Robert L. Beerman, New York City, for Orth-O-Vision, Inc.; Barry A. Wadler, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for Home Box Office, Inc. and Time Inc.; Robert D. Joffe, Calvin R. House, Marc J. Schiller, Rosalyn D. Young, New York City, of counsel.

## OPINION

GAGLIARDI, District Judge:

Plaintiff Orth-O-Vision, Inc. ("Orth-O-Vision") has commenced this action against Home Box Office, Inc. ("HBO"), Time, Inc. ("Time"), and Morris Tarshis, Director of Franchises of the City of New York, alleging *inter alia*, violations of the federal antitrust laws and breach of contract. Jurisdiction lies pursuant to 28 U.S.C. §§ 1337, 1343(3) and principles of pendent jurisdic-

tion. Defendants Time and HBO have counterclaimed for violations of the Federal Communications Act, the Copyright Act, New York's Penal Law and the common law of unfair competition. Time and HBO now move for partial summary judgment on each of these claims and a permanent injunction restraining Orth-O-Vision from appropriating HBO's subscription program service. Alternatively, Time and HBO move for a preliminary injunction restraining Orth-O-Vision from infringing HBO's copyrights. For the reasons stated and to the extent indicated below, HBO's motion for partial summary judgment and a permanent injunction is granted.

## Statement of Facts [1]

HBO, a subsidiary of Time, transmits a pay television subscription program service from a microwave transmitter atop the Empire State Building. HBO's programming consists both of programs originated and copyrighted by HBO and programs, such as motion pictures and sporting events, the performance rights to which it has acquired through licensing agreements. HBO leases its microwave transmitter from Microband Corporation of America ("Microband"), a common carrier licensed to provide Multipoint Distribution Service ("MDS") by the Federal Communications Commission ("FCC"). HBO has contracted with a number of affiliates to provide its program service to multiple fixed receive points, generally large residential buildings, for a monthly service fee. The affiliates, in turn, acting as middlemen, sell the program service to individual residents. Each building is equipped with reception equipment, including a microwave parabolic antenna, a frequency down-converter, an address decoder, and a coaxial cable or antenna lead-in wire which feeds the MDS generated signals to home television receivers. Individual subscribers pay a monthly fee to the affiliates for the program service.

1. The relevant facts are drawn from the affidavits submitted by the parties on this motion and the testimony offered at a hearing held in October, 1978 on Orth-O-Vision's motion for a preliminary injunction.

By written agreement dated April 3, 1974, Orth-O-Vision became an HBO affiliate. The agreement required Orth-O-Vision to remit monthly payments to HBO on a "per subscriber" basis. The agreement permitted Orth-O-Vision to market the HBO service in two apartment houses in Queens and expressly denied Orth-O-Vision the exclusive right to market the service in Queens or other areas. A standard "merger clause" read as follows:

> This Agreement supersedes and cancels all prior negotiations and undertakings in the premises between the parties, contains all of the terms, conditions and premises of the parties hereto and shall be binding only when executed by both parties hereto. No officer, employee or representative of HBO has any authority to make any representation or promise not contained in this Agreement, and Affiliate has not executed this agreement on reliance of any such representation or promise.

In addition, the agreement provided that in the event of Orth-O-Vision's breach of any of the terms or provisions, HBO "may, at its option, suspend delivery of the HBO Service until such default is ended or remedied, terminate this Agreement, or may declare this Agreement breached and all unpaid amounts including all Minimum Payments immediately due and payable."

Orth-O-Vision's president, Alfred Simon, contends that in the course of the negotiation of the 1974 agreement, HBO officials represented to him that, notwithstanding the unambiguous contractual provisions to the contrary, Orth-O-Vision would be permitted to defer payments to HBO for its program service until such time as Orth-O-Vision had the financial capability to pay and that Orth-O-Vision would have the unlimited right to expand its operations throughout the Borough of Queens. Simon further contends that HBO reaffirmed these oral understandings after the execution of the 1974 agreement. Defendants deny having made any such oral representations to Simon either before or after the execution of that contract.

From the commencement of their relationship in 1974, Orth-O-Vision's payments to HBO were sporadic and incomplete. In November, 1974, the parties met to discuss both Orth-O-Vision's indebtedness to HBO and its right to expand into other buildings. HBO's officers informed Simon that any further expansion had to be "on a solid financial base," and Orth-O-Vision agreed to make minimum monthly payments to HBO of $4500. Orth-O-Vision failed to meet this new payment schedule and in early 1975, HBO sent a letter to Orth-O-Vision stating that Orth-O-Vision's outstanding indebtedness exceeded $31,000 and threatening to terminate HBO's service within forty-five days. This threat was not carried out. In April, 1975, the parties met once again and Orth-O-Vision agreed to pay receivables on a current basis and an additional $27,000 over the following year to cover arrearages. Once again, Orth-O-Vision failed to make the required payments. In October, 1975, HBO sent Orth-O-Vision notice of termination of the contract because of its continued inability to pay. The parties again met to resolve their differences in November, 1975, and HBO agreed to rescind its termination in exchange for Orth-O-Vision's promise to make minimum monthly payments of $2,000 in liquidation of the total amount then due of $65,000. Orth-O-Vision's payments remained sporadic.

Through 1975, the parties also disagreed as to Orth-O-Vision's right to expand its operations to other apartment buildings in Queens. HBO informed Orth-O-Vision that no further expansion would be permitted as a result of New York's enactment of legislation limiting the expansion of MDS systems within the state.[2] Orth-O-Vision con-

---

**2.** The enactment in question, presently codified as Article 28 of the Executive Law, created a State Commission on Cable Television ("CCT") with regulatory and licensing authority over cable television. In its *Clarification of Policy* (Docket No. 90085), (April 4, 1977), the CCT declared that MDS systems such as Orth-O-Vision's offering pay TV programming to multiple unit dwellings were not exempt from its regulation. Consequently, Orth-O-Vision was re-

tends, however, that HBO engaged in "selective enforcement" of the statute; while prohibiting Orth-O-Vision from entering new buildings in Queens, HBO allegedly permitted other affiliates to expand into other boroughs.

In March, 1976, notwithstanding their earlier disputes, Orth-O-Vision and HBO met to discuss a new affiliation agreement. Simon contends that in the course of these negotiations HBO officials told him that Orth-O-Vision would have to give up its rights to deferral of payments to HBO. In addition, HBO's officials allegedly told Simon that Orth-O-Vision would not be permitted to expand until New York changed its law. Simon contends that he told HBO that he disagreed with its interpretation of New York law. Nevertheless, in July 1976, Orth-O-Vision and HBO entered into a new affiliate agreement superseding the 1974 agreement. Orth-O-Vision was represented by counsel during the course of these negotiations.

Under the 1976 agreement, Orth-O-Vision agreed to pay to HBO $5.00 per month per subscriber. In a separate letter agreement, Orth-O-Vision agreed to pay back its indebtedness of approximately $118,000 in monthly installments of at least $2500. The new affiliate agreement listed approximately thirty-two apartment complexes to which Orth-O-Vision would be permitted to sell HBO's program service and expressly provided that any further expansion would require HBO's consent. The parties clearly viewed MDS as a precursor to cable television in Queens. HBO was expressly permitted to terminate the agreement on forty-five days' written notice if it entered into an agreement to supply programming to a cable television system franchised to operate in Queens. If HBO terminated the agreement pursuant to this clause, it would

be required to "make all reasonable efforts" to encourage the cable television system to agree to purchase Orth-O-Vision's assets and subscribers "for reasonable compensation". In the event of Orth-O-Vision's breach, HBO again retained the right either to suspend delivery until the default were remedied, terminate the agreement, or declare the agreement breached and accelerate Orth-O-Vision's payment obligation. The agreement once again recited that it contained the "full understanding of the parties" and that any modification or waiver of its provisions would have to be in writing.

Since commencing this lawsuit in June, 1977, Orth-O-Vision has not made any payments to HBO despite the fact that Orth-O-Vision has continued to market HBO's program service to Queens subscribers. Nor has Orth-O-Vision supplied HBO with the monthly subscriber reports required by the contract. Orth-O-Vision's stated justifications for these actions are: 1. the oral understanding with HBO permits Orth-O-Vision to defer payment until it is sufficiently profitable; and 2. the damages sought by Orth-O-Vision from HBO exceed the amount owed pursuant to the contract. Orth-O-Vision currently owes HBO approximately $750,000 and, over the entire course of its relationship with HBO, Orth-O-Vision has made payments of only $187,951.92. On August 17, 1978, counsel for HBO informed Orth-O-Vision, through its counsel, that the 1976 affiliate agreement was terminated and that Orth-O-Vision should cease the appropriation of HBO's signal. MDS technology did not permit HBO to discontinue its transmissions to Orth-O-Vision, but HBO did cease the shipment of subscriber program guides as required by the affiliate contract. In October, 1978, after a hearing,

quired either to apply for a municipal cable television franchise by June 4, 1977, or to eliminate its pay programming service by that date. The object of the CCT's action was to permit municipalities to terminate MDS-transmitted pay programming provided to multi-unit dwellings. In March 1977, Orth-O-Vision filed a petition for expedited relief with the Federal Communications Commission ("FCC"), re-

questing that the FCC preclude the CCT from regulating Orth-O-Vision's transmissions. On September 22, 1978, the FCC held that the CCT's policies were preempted to the extent that their effect would be to prohibit the receipt of federally-authorized MDS transmissions of HBO's programming. *In the Matter of Orth-O-Vision, Inc.*, 69 F.C.C.2d 657.

this court denied Orth-O-Vision's motion for a preliminary injunction requiring HBO to deliver the program guides on the grounds that Orth-O-Vision had failed to show irreparable injury and had shown doubtful success on the merits.

Orth-O-Vision has continued to market HBO's program service with program guides that identify the service as Orth-O-Vision's and nowhere mention HBO. On November 2, 1978, counsel for HBO again informed Orth-O-Vision's counsel that HBO considered the contract terminated and that Orth-O-Vision's continued interception and use of the HBO signal violated federal and state law. Some of the programs transmitted by HBO are original works in which HBO owns and has registered the copyrights. From September, 1978 through February, 1979 twelve of these copyrighted works were transmitted approximately 50 times in the aggregate to all of HBO's New York area affiliates. Each of those transmissions was intercepted by Orth-O-Vision and retransmitted to its subscribers. HBO has sent monthly bills to Orth-O-Vision since the August, 1978 termination and has, on occasion, referred potential new customers to Orth-O-Vision.

Orth-O-Vision's complaint alleges a conspiracy among defendants HBO, Time and Tarshis in violation of the federal antitrust laws for the purpose of limiting plaintiff's ability to supply pay-television originated by HBO to customers and potential customers in the New York metropolitan area. Orth-O-Vision alleges that Knickerbocker Communications Corporation ("Knickerbocker"), now a Time subsidiary, has applied for a franchise from New York City and State for the delivery of pay television services to the Borough of Queens, and that

the defendants have sought to destroy plaintiff's business so that Knickerbocker would be able to obtain a franchise and operate without competition from Orth-O-Vision. In 1978, the New York City Board of Estimate granted a cable television franchise to Knickerbocker for the Borough of Queens.[3] Orth-O-Vision views the instant motion as part of the scheme to drive it out of business. Orth-O-Vision contends that if HBO prevails on this motion, Orth-O-Vision will be put out of business and Knickerbocker will acquire its good will without reimbursing Orth-O-Vision therefor, as required by the 1976 affiliate agreement.

## Discussion

I. *The Propriety of HBO's Termination of the 1976 Affiliate Agreement*

Since each of HBO's claims turns upon a finding that Orth-O-Vision lacks the authority to use HBO's signal, the threshold issue on this motion is whether HBO lawfully terminated the 1976 affiliate agreement with Orth-O-Vision. Orth-O-Vision's failure to remit payments to HBO and to submit subscriber reports each month since April, 1977 is clearly a material breach of the 1976 affiliate agreement. That agreement expressly grants to HBO the right, upon Orth-O-Vision's breach of any of its terms, to suspend delivery of its service and terminate its affiliate relationship with Orth-O-Vision. Orth-O-Vision contends, however, that its refusal to pay was justified in light of HBO's oral representations made both before and after the signing of the 1974 agreement to the effect that Orth-O-Vision would be permitted to defer payments until it was financially capable to do so and to expand without limitation.[4]

---

**3.** By decision dated March 19, 1979, however, the New York Supreme Court, New York County granted Orth-O-Vision's motion for a preliminary injunction against the implementation of Knickerbocker's franchise contract on the ground that the New York City officials had failed to comply with certain requirements of the City Charter in granting the franchise. *Orth-O-Vision, Inc. v. City of New York*, Index No. 20563/78 (Kassal, J.).

**4.** There is some doubt whether Orth-O-Vision still maintains this position. Orth-O-Vision's memorandum of law in opposition to defendants' motion identifies only two issues of fact concerning Orth-O-Vision's continued authority to vend HBO's program service: 1. HBO's post-termination conduct (*e. g.*, sending monthly bills and referring customers to Orth-O-Vision); and 2. HBO's involvement in a scheme to terminate plaintiff in violation of the antitrust laws. Because Orth-O-Vision raised this contention in

It is not at all clear why HBO's oral representations in 1974 and 1975 are relevant to a determination of the parties' rights with respect to the 1976 affiliate agreement, which expressly provides that it is intended to supersede all previous agreements between the parties. Moreover, the 1976 agreement contains a detailed "merger clause" stating that the written agreement constitutes the entire agreement between the parties and that any modification thereof must be signed by the party to be charged. As a matter of New York law,[5] the existence of such a clause creates a strong presumption, unrebutted by Orth-O-Vision, that the parties intended their agreement to be a complete integration of their mutual promises. *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 452 (2d Cir.1977); *Fogelson v. Rackfay Construction Co.*, 300 N.Y. 334, 340, 90 N.E.2d 881 (1950). "[T]he overarching question is whether, in the context of the particular setting, the oral agreement was one which the parties would ordinarily be expected to embody in the writing." *Lee v. Joseph E. Seagram & Sons, Inc., supra*, 552 F.2d at 451. The parol terms Orth-O-Vision seeks to prove—the right to defer payments and to expand without limitation—are "so clearly connected with the principal transactions as to be part and parcel of it." *Gem Corrugated Box Corp. v. National Kraft Container Corp.*, 427 F.2d 499, 502–03 (2d Cir.1970) (citation omitted). Indeed, the 1976 agreement unambiguously defines Orth-O-Vision's monthly obligation to pay and explicitly conditions the right of expansion upon HBO's approval.[6] As such, New York's parol evidence rule bars the admission of the alleged prior or contemporaneous oral representations to vary or contradict these terms of the 1976 affiliate agreement concerning payment and expansion.[7]

Orth-O-Vision next contends that HBO's participation in an unlawful conspir-

its September, 1978 motion for a preliminary injunction, the court will assume that Orth-O-Vision still adheres to this view.

5. The 1976 agreement does not contain a choice of law clause, but the parties have properly assumed that New York law controls in light of New York's relationship to the negotiation, execution and performance of the agreement. *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 248 N.E.2d 576, 300 N.Y.S.2d 825–28 (1969).

6. Plaintiff does not contend that the 1976 agreement is ambiguous in these respects such that the court would be permitted to resort to extrinsic evidence to determine the intent of the parties. *See Neonex International Ltd. v. Norris Grain Company*, 338 F.Supp. 845, 851–52 (S.D.N.Y.1972). Nor does plaintiff argue that HBO made any oral modification or waiver of these explicit contractual provisions after the execution of the *1976* affiliate agreement. *See Id.* at 853. The only allegation of modification made by Orth-O-Vision is a vague reference to discussions between the parties prior to HBO's decision to limit plaintiff's expansion in 1975. (Simon aff. dated March 13, 1979). There is simply no contention in plaintiff's affidavits that either at the time the 1976 agreement was negotiated or thereafter, HBO made any representations to the effect that payment could be deferred or that expansion would be unlimited. Consequently, no issues of fact are presented with respect to the parties' intent in reaching the 1976 agreement. *Compare Hey-*

*man v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975).

7. Orth-O-Vision also argues that, in the course of the negotiation of the 1976 agreement, HBO misrepresented its motives for requiring a clause conditioning further expansion upon HBO's approval. HBO allegedly claimed that New York regulations limited the expansion of MDS systems, but permitted other affiliates to expand. The parol evidence rule does not bar proof of extrinsic evidence offered to prove fraud in the inducement. *Barash v. Pennsylvania Terminal Real Estate Corp.*, 26 N.Y.2d 77, 308 N.Y.S.2d 649, 656, 256 N.E.2d 707, 711 (1970). Given the history of the parties' affiliate relationship and HBO's insistence in 1974 and 1975 upon Orth-O-Vision's financial stability as a prerequisite to further expansion, the "materiality" of the alleged misrepresentation is at best questionable. But even if one were to assume, for the sake of argument, that HBO's statements constituted fraudulent misrepresentations of material facts, Orth-O-Vision's remedy is to sue for rescission, *Sabo v. Delman*, 3 N.Y.2d 159, 164 N.Y.S.2d 714, 717, 143 N.E.2d 906, 908 (1957), or for reformation of that portion of the contract which was the subject of the fraud. *Brandwein v. Provident Mutual Life Insurance Co.*, 3 N.Y.2d 491, 168 N.Y.S.2d 964, 967–68 (1957). Orth-O-Vision cites no authority for the proposition that HBO's alleged fraud in the inducement permits Orth-O-Vision to engage in "selective enforcement" of the terms of the agreement.

acy to limit Orth-O-Vision's expansion and to monopolize the pay television market in Queens renders HBO's termination of the affiliate agreement unlawful. Notwithstanding HBO's contractual right of termination, if HBO's actions "were part and parcel of unlawful conduct or agreement with others or were conceived in a purpose to unreasonably restrain trade, control a market, or monopolize, then such conduct might well run afoul of the Sherman Law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 468–69, 82 S.Ct. 486, 489, 7 L.Ed.2d 458 (1962). Even if HBO has violated the antitrust laws, however, this would not relieve Orth-O-Vision of its obligations under the affiliate agreement. *Kelly v. Kosuga*, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1958); *Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947). "Past the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act, the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, 'of preventing people from getting other people's property for nothing when they purport to be buying it.'" *Kelly v. Kosuga, supra,* 358 U.S. at 520, 79 S.Ct. at 432. HBO's alleged anticompetitive activities do not excuse Orth-O-Vision's appropriation of the HBO signal.

■ Finally, Orth-O-Vision argues that certain of HBO's actions subsequent to the termination of the contract equitably estop HBO from asserting Orth-O-Vision's breach of the agreement. Specifically, Orth-O-Vision contends that HBO, by billing Orth-O-Vision for use of its signal subsequent to termination and referring potential customers for the program service to Orth-O-Vision, acted in a manner inconsistent with the contract's repudiation and must therefore be estopped from terminating it. New York courts have defined the doctrine of equitable estoppel in terms of six essential elements. The party claiming estoppel must establish: 1. conduct by the estopped party which amounts to concealment of material facts; 2. the estopped party's intention that such conduct shall be acted upon by the other party; 3. the estopped party's

knowledge of the real facts; 4. the other party's ignorance of the facts; 5. his reliance upon the conduct of the estopped party; and 6. his change of position to his prejudice as a result. *Gratton v. Dido Realty Co., Inc.*, 89 Misc.2d 401, 391 N.Y.S.2d 954, 955 (Sup.Ct.1977), *aff'd*, 63 App.Div.2d 959, 405 N.Y.S.2d 1001 (1978). Orth-O-Vision's claim of estoppel founders upon virtually every one of these doctrinal elements. HBO's billing of Orth-O-Vision for its use of the signal and its referral of customers to HBO, when considered in conjunction with HBO's letters demanding that Orth-O-Vision desist from the interception of its signal, HBO's termination of the distribution of its program guides, and HBO's vigorous litigation of the instant motion for injunctive relief, can hardly be interpreted as materially misleading behavior. In any event, Orth-O-Vision's affidavits set forth no facts showing that it has relied upon Orth-O-Vision's "equivocal" acts to its detriment. Orth-O-Vision's defense of equitable estoppel must thus be rejected.

Having concluded that HBO's termination of the 1976 agreement deprived Orth-O-Vision of the authority to vend HBO's signal, the court will next consider HBO's various claims for injunctive relief.

## II. *HBO's Claims for Summary Judgment and Permanent Injunctive Relief*

### A. *The Federal Communications Act Claim*

■ The Federal Communications Act provides a "mantle of privacy" for all communications except radio and television broadcasts intended for the public. *KMLA Broadcast Corp. v. Twentieth Century Cigarette Vendors Corp.*, 264 F.Supp. 35, 39 (C.D.Cal.1967). 47 U.S.C. § 605 provides in pertinent part:

No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. . . . This section

shall not apply to the receiving, divulging, publishing or utilizing the contents of any radio communication which is broadcast . . . for the use of the general public . . .

The Federal Communication Act elsewhere defines "radio communication" as "the transmission by radio of . . . signals, pictures, and sounds of all kinds" and "broadcast" as the "dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations." 47 U.S.C. § 153(b), (o). In *Reitmeister v. Reitmeister*, 162 F.2d 691, 694 (2d Cir.1947), the Second Circuit recognized an implied private right of action for violations of this section.[8] The principal issue raised by this claim is whether HBO's radio communications are "broadcast", *i. e.*, intended to be received by the general public and, therefore, exempted from the protections of § 605.

The leading precedent concerning the statutory definition of "broadcast" is *Functional Music, Inc. v. FCC*, 107 U.S.App.D.C. 34, 274 F.2d 543, *cert. denied*, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 81 (1958). *Functional Music* involved a functional background music service which had been "superimposed upon traditional [FM] broadcasting services." 274 F.2d at 544. Subscribers, generally commercial institutions, received the petitioner's regularly scheduled broadcasts but with all advertising matter received by the ordinary listener deleted. For a fee, petitioner transmitted a supersonic signal which activated special equipment installed in subscribers' radio receivers to cut off the advertisements heard over conventional receivers. Reasoning that the service's format was highly specialized and directly adaptable to subscribers' needs, and that the petitioner exacted a fee for its services, the FCC concluded that the petitioner's operations were "point-to-point communications" and not properly transmittable by a station licensed to provide a broadcasting service. *Id.* at 545, 548. The District of Columbia Circuit, per Judge Bazelon, vacated the FCC's order, stating:

> [T]he practices pointed to by the Commission do not form a basis for concluding that functional operations are non-broadcasting in nature . . . For the Communications Act specifies that broadcasting is "the dissemination of radio communications intended to be received by the public." And program specialization and/or control is not necessarily determinative of this requisite intent, and therefore dispositive of broadcasting status . . . Broadcasting remains broadcasting even though a segment of those capable of receiving the broadcast signal are equipped to delete a portion of that signal. In contrast to the . . . service in the cases [cited by the FCC], which by its very nature negates an intent for *public* distribution, functional programming can be, and is, of interest to the *general* radio audience.

*Id.* at 548 (emphasis in original).

The issue presented in this case is whether the converse of the rule in *Functional Music* is also true: does the transmission of programming which is of interest to the general public constitute "broadcasting" even though one cannot view the programs

8. The *Reitmeister* holding was subsequently reaffirmed in *Pugach v. Dollinger*, 277 F.2d 739, 743 (2d Cir. 1960), *aff'd per curiam on other grounds*, 365 U.S. 458, 81 S.Ct. 650, 5 L.Ed.2d 678 (1961) and *Guido v. City of Schnectady*, 404 F.2d 728, 731 (2d Cir. 1968), *cert. denied*, 395 U.S. 962, 89 S.Ct. 2099, 23 L.Ed.2d 748 (1969). Several other decisions have followed *Reitmeister*, the most recent one being *Home Box Office, Inc. v. Pay TV of Greater New York*, 467 F.Supp. 525, 528 (E.D.N.Y.1979), in which Judge Nickerson, on facts quite similar to those presented here, granted a preliminary injunction restraining another pay TV company from intercepting HBO's program service. On June 11, 1979, Judge Nickerson granted HBO's motion for summary judgment and a permanent injunction to the same effect. Since the defendants in *Pay TV* did not question the applicability of section 605, Judge Nickerson had no occasion to consider whether the right of action recognized in *Reitmeister* ought still to be judicially implied applying the standards set forth in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The court need not address this issue at the present time in light of its view that HBO has failed to show that its transmissions do not constitute "broadcasting" for the purposes of the statute.

without paying a fee for special equipment? In *In the Matter of Amendment of Part 73 of the Commission's Rules and Regulations (Radio Broadcast Services) to Provide for Subscription Television Service*, 3 F.C.C.2d 1 (1966), the FCC sought to answer this exact question in deciding whether over-the-air subscription television ("STV") fell within the statutory definition. STV involves the over-the-air transmission of programs intended to be viewed only by those who pay a charge. Those transmitting the signal, generally television broadcast stations, transmit a "scrambled" signal that may be viewed intelligibly only by those with "unscrambling" devices attached to their home television sets. Rejecting the contention that limiting transmission to those individuals willing to pay could not constitute "broadcasting", the FCC stated:

> The evident intention of any station transmitting subscription programs would be to make them available to all members of the public within range of the station . . . [T]he primary touchstone of a broadcast service is the intent of the broadcaster to provide radio or television service without discrimination to as many members of the general public as can be interested in the particular program as distinguished from a point-to-point message service to specified individuals . . . "[I]ntent" may be inferred from the circumstances under which material is transmitted, and . .

the number of actual or potential viewers is not especially important.

*Id.* at 9.

From the factual record before the court on this motion for summary judgment, there is little to distinguish HBO's MDS transmissions from those of STV systems. Both media involve the transmission of radio communications that members of the general public cannot receive without the installation of special equipment for a fee. More significantly, HBO's programming, consisting of recent movies, sports events and variety shows, differs little from conventional broadcast fare and is obviously intended to appeal to a mass audience.[9]

■ One of the important circumstances from which HBO's "intent" might be inferred is the extent to which MDS facilities are technologically capable of reaching the general public. The technological limitations of MDS may be such as to render the analogy to over-the-air subscription television inapt, but no such showing has been made by HBO. Accordingly, HBO's motion for partial summary judgment on its Federal Communications Act claim must be denied.[10]

### B. The State Law Claims: Unfair Competition and the New York Penal Law

HBO next claims that Orth-O-Vision's unauthorized use of the HBO program service may be enjoined pursuant to two distinct state law theories. HBO invokes New

9. Thus, *KMLA Broadcasting Corporation v. Twentieth Century Cigarette Vendors Corporation, supra,* the case upon which HBO principally relies, is not particularly apposite. *KMLA* involved an FM radio station's transmission of background music on a separate, subcarrier frequency. The station's main channel broadcasts were intended for the public at large. The court found, however, that the background music transmissions on the subcarrier frequency, which were sold only to industrial and mercantile subscribers, did not constitute "broadcasting". 264 F.Supp. at 40–41.

10. HBO argues that the FCC has classified MDS transmissions as non-broadcast, point-to-point communications. The FCC's interpretation of the Communications Act is undoubtedly entitled to great deference, *KMLA Broadcasting Corp. v. Twentieth Century Cigarette Vendors Corp.,* 264 F.Supp. at 41–42, but the FCC's limited pronouncements on the issue do not necessarily support HBO's position. In formulating a regulatory structure for MDS transmission, the FCC has merely recognized that its primary use has been not to provide entertainment or information to the public but rather to provide commercial and industrial subscribers with reception of specialized communications in accordance with their specific requirements. *See, e. g., In re Applications of Midwest Corp.,* 53 F.C.C.2d 294, 300 (1975), 38 F.C.C.2d 897, 899 (1973). The court does not read these rulings to preclude a finding that an MDS system utilized to provide pay television programming of general appeal and marketed to large numbers of non-commercial viewers engages in broadcasting.

York's common law of unfair competition, a well-developed doctrine which New York's courts, following the seminal case of *International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), have used to grant relief in a wide variety of situations to insure that one does not misappropriate the results of the skill, expenditures and labors of another. *See, e. g., Flexitized, Inc. v. National Flexitized Corporation,* 335 F.2d 774, 781 (2d Cir. 1964); *Capitol Records, Inc. v. Greatest Records, Inc.,* 43 Misc.2d 878, 252 N.Y.S.2d 553 (Sup.Ct.1964); *Metropolitan Opera Association, Inc. v. Wagner-Nichols Records Corp.,* 199 Misc. 786, 101 N.Y.S.2d 483, 489 (Sup.Ct.1950). Alternatively, HBO asks the court to imply a private right of action under New York Penal Law § 165.15, which provides that a person is guilty of theft of services when:

> With intent to avoid payment by himself or another person of the lawful charge for any telecommunications service, including without limitation, cable television service . . . which is provided for a charge or compensation, he obtains . . . such service for himself or an-

other person . . . or avoids . . payment therefor . . .

■ This court's initial inquiry must be whether Congress, pursuant to its powers to regulate commence and to grant copyrights, has prohibited New York's regulation of the aspects of commerce involved in this case. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); *Goldstein v. California,* 412 U.S. 546, 561, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). Although the Constitution does not prohibit the states from protecting intellectual property, *Goldstein, supra,* 412 U.S. at 553–61, 93 S.Ct. 2303, when Congress has "unmistakably ordained that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall." *Jones, supra,* 430 U.S. at 525, 97 S.Ct. at 1309.

■ Fortunately for our purposes here, Congress, in the Copyright Act of 1976, made its preemptive intentions quite explicit.[11] Pursuant to 17 U.S.C. § 301(a), Congress has abolished, effective January 1, 1978, all state law rights in copyrightable

11. Prior to the enactment of the new copyright statute the law of preemption in this area was in a state of disarray. In *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day-Brite Lighting Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), the Supreme Court held that a state cannot confer protection under its unfair competition laws against the sale of articles copied from others manufactured under invalid patents, simply because of possible confusion as to their source. The Court reasoned that a state's extension of the life of the patent monopoly beyond its expiration date would subvert the Congressional balance between rewarding useful invention and permitting the public to enjoy the fruits of innovation.

The *Sears-Compco* doctrine was generally viewed as applicable to copyright law, *see, e. g., Cable Vision, Inc. v. KUTV, Inc.,* 335 F.2d 348, 350 n.1 (9th Cir. 1964), *cert. denied,* 379 U.S. 989, 35 S.Ct. 700, 13 L.Ed.2d 609 (1965), but a number of lower courts, generally in cases involving "tape piracy", sought to limit its preemptive effect to state laws involving "copying", rather than outright "appropriation" of another's product. *See, e. g., Compumarketing Services Corp. v. Business Envelope Manufacturers, Inc.,* 342 F.Supp. 776, 777–78 (N.D.Ill.1972); *Tape Industries Association of*

*America v. Younger,* 316 F.Supp. 340, 350 (C.D. Cal.1970) (three-judge court), *appeal dismissed,* 401 U.S. 902, 91 S.Ct. 880, 27 L.Ed.2d 801 (1971); *Capitol Records, Inc. v. Greatest Records, Inc.,* 43 Misc.2d 878, 252 N.Y.S.2d 553, 556–57 (1964). This distinction was criticized by courts and commentators alike as insufficiently protective of federal interests. *See, e. g., International Tape Manufacturers Association v. Gerstein,* 344 F.Supp. 38, 50–54 (S.D. Fla.1972), *vacated for lack of ripeness,* 494 F.2d 25 (5th Cir. 1974); 1 M. Nimmer, *Copyright* § 1.01[B] at 1–17 to –19 (1978 ed.); Note, The "Copying-Misappropriation Distinction: A False Step in the Development of the *Sears-Compco* Pre-Emption Doctrine, 71 Colum.L. Rev. 1444 (1971). Additional confusion was engendered with the decisions in *Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973) (sustaining state statute affording copyright protection for subject not eligible under federal copyright law) and *Kewanee Oil Corp. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) (sustaining state common law of trade secrets), which some viewed as undermining the *Sears-Compco* doctrine. *Ives Laboratories, Inc. v. Darby Drug Co.,* 601 F.2d 631, 640, 641 (2d Cir. June 11, 1979).

material that are "equivalent to any of the exclusive rights" of copyright recognized in the statute. The only state law rights preserved by Congress are those which involve: 1. subject matter that is not copyrightable; 2. causes of action arising from works created before January 1, 1978; or 3. rights that are not equivalent to any of the exclusive rights recognized by the federal statute. 17 U.S.C. § 301(b). The works exhibited by HBO are generally "motion pictures and other audiovisual works", 17 U.S.C. § 102(6), and are therefore proper subject matter for copyright protection. Moreover, many of the works exhibited by HBO were created after January 1, 1978. HBO's state law claims are thus clearly pre-empted by the Copyright Act unless they involve rights that are "not equivalent" to the exclusive rights of copyright set forth in 17 U.S.C. § 106.

▪ In the case of motion pictures and audiovisual works, the Copyright Act grants the copyright owner exclusive rights to "perform" works (to show their images in any sequence or to make the sounds accompanying them audible to the public by means of any process) and to "display" them (to show individual images nonsequentially to the public by means of any process). The common law unfair competition doctrine upon which HBO relies seeks to vindicate equivalent, if not identical, rights; the misappropriation of which HBO complains is the lost right to exhibit for a profit

the audiovisual works that comprise its programming. *See, Metropolitan Opera Association, Inc. v. Wagner-Nichols Corp., supra,* 101 N.Y.S.2d at 492. In the context of this case, "misappropriation" consists simply of acts of public performance. As such, it undoubtedly constitutes a right "within the general scope of copyright as specified by section 106" and HBO's unfair competition claim is preempted by federal law. *See,* 1 M. Nimmer, *supra,* 1.01[B], at 1–16 to 1–19.[12]

▪ HBO's New York Penal Law claim arguably survives federal preemption because it may be construed to involve an element which is not part of a cause of action for copyright infringement—the intent to avoid payment. Even if this claim were so construed, HBO has cited no New York authority in support of judicial implication of a private right of action for violations of the statute. Moreover, Orth-O-Vision contends that its intent has been to *defer,* not to avoid, payment to HBO. An issue of fact is thus presented with respect to this claim which cannot be resolved on HBO's motion for summary judgment.

Accordingly, HBO's motion for summary judgment on both its unfair competition and New York Penal Law claims must be denied.

## C. The Copyright Law Claim

▪ As the copyright owner of twelve audiovisual works which have been retran-

---

12. As Professor Nimmer notes, § 301's legitimate history is somewhat confusing on this point. *See* 1 M. Nimmer, *supra,* § 1.01[B], at 1–13 to 1–16. As originally sent to the floor of the House of Representatives, this section enumerated several specific state law theories as examples of rights "not equivalent to any of the exclusive rights" recognized by federal law. Among these was "misappropriation not equivalent to any of such exclusive rights." This language was ultimately deleted from the final version of the bill, but it is unclear from the legislative history whether Congress thereby intended to leave the state law of misappropriation intact. The court concurs with Professor Nimmer's view that § 301(b)(3) as finally enacted requires a determination as to whether state misappropriation law is "equivalent" to copyright. *Id.* at 1–16.

HBO also claims that Orth-O-Vision, by distributing program guides to subscribers that do not attribute the programming to HBO, has engaged in "palming off", a business tort akin to "unfair competition". Because the element of deception inherent in "palming off" is not an element of a copyright infringement claim, the "passing off" cause of action is not preempted by federal law. 1 M. Nimmer, *supra,* § 1.01[B], at 1–12 to 1–13. Nevertheless, this is not a case of "palming off" because that tort involves the tortfeasor's misleading customers into believing that the product he produces emanates from or has been endorsed by another. *See, Metropolitan Opera Association v. Wagner-Nichols Recorder Corp., supra,* 101 N.Y.S.2d at 491. Ortho-O-Vision, by contrast, has apparently misled customers that a service emanating from another has been produced by Orth-O-Vision itself.

smitted by Orth-O-Vision to its subscribers without authorization, HBO has standing to sue for infringement and, by registering its copyrights, HBO has fulfilled the procedural prerequisite for commencing an infringement suit. 17 U.S.C. §§ 411(a), 501(b).

■ The initial issue raised by HBO's copyright claim is whether Orth-O-Vision's unauthorized retransmission constitutes infringement. Use of copyrighted material no matter how extensive and widespread is not infringement unless it conflicts with the statutorily recognized exclusive rights. *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975). Under the 1909 Copyright Act and two Supreme Court decisions interpreting it, Orth-O-Vision's retransmission of copyrighted material, though unauthorized, would not have been deemed infringement. In *Fortnightly Corp. v. United Artists Television, Inc.,* 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968) and again in *Teleprompter Corp. v. Columbia Broadcasting System, Inc.,* 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974), the Court held that cable television systems do not "perform" copyrighted works when they transmit copyrighted works to subscribers. The Court reasoned that the cable television function of enhancing the subscriber's capacity to receive broadcast signals, irrespective of the distance between the subscriber and the broadcaster or the extent to which the cable operator originated his own programming, was too passive a role to be treated as "performance" and thus did not conflict with the copyright owner's exclusive right to perform his work.

The Copyright Act of 1976, however, has substantially revamped the law of secondary transmissions. Although the 1976 Act does not expressly define secondary transmission as "performance," both the structure of the Act and its legislative history establish clearly that this was the Congres-

sional intent. 2 M. Nimmer, *supra* § 8.18[B], at 8–195 to –198. Since Orth-O-Vision's secondary transmissions do not fall within the scope of any of the exemptions or limitations set forth in 17 U.S.C. § 111, its secondary transmissions of HBO's copyrighted works constitute acts of infringement.

A permanent injunction, the relief requested by HBO, is frequently granted to the prevailing party in an infringement action as a matter of equitable discretion. *See, e. g., Samet & Wells, Inc. v. Shalom Toy Co., Inc.,* 429 F.Supp. 895, 904 (E.D.N.Y.1977); *Fisher-Price Toys v. My-Toy Co.,* 385 F.Supp. 218, 223 (S.D.N.Y.1974); 3 M. Nimmer, *supra,* § 14.06[B] at 14–49 to –50. Orth-O-Vision, however, raises two objections to a permanent injunction. First, Orth-O-Vision claims that the court's decree must be limited to the twelve copyrighted works that Orth-O-Vision has already retransmitted to its subscribers. Second, Orth-O-Vision argues that HBO's violations of the antitrust laws bar injunctive relief under the doctrine of unclean hands.

■ As of the date of the submission of its motion, HBO has transmitted twelve registered copyrighted works which Orth-O-Vision has infringed. The injunction sought by HBO, however, would extend not only to future infringements of those twelve works but also to any future infringement of HBO's shows not yet published or copyrighted. Orth-O-Vision argues that registration of one's copyright in a given work is a statutory prerequisite to commencing an action for its infringement, and that this court cannot enjoin the infringement of any work which has not been registered.[13] There is some case support for Orth-O-Vision's view, *see, e. g., Massapequa Publishing Co. v. The Observer, Inc.,* 126 U.S.P.Q. 229, 230 (E.D.N.Y.1960); *Sweet v. G. W. Bromley & Co.,* 154 F. 754, 755 (C.C.

---

13. Orth-O-Vision acknowledges that 17 U.S.C. § 411(b) contains an exception to the registration requirement for works consisting of sounds or images and for which the fixation is made simultaneously with transmission. Orth-O-Vision contends, and it is not disputed, that

HBO has failed to comply with the procedural requirements of this section as to future works, *i. e.,* serving notice upon Orth-O-Vision prior to transmission of the specific works involved and subsequently registering those works.

Pa.1907), but other courts have not hesitated to enjoin, as a matter of equitable discretion, the infringement of works yet unpublished. *See, e. g., Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 418 F.Supp. 620 (S.D.N.Y.1976), *aff'd on other grounds*, 558 F.2d 91 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978); *Southwestern Bell Telephone Co. v. Nationwide Independent Directory Service, Inc.*, 371 F.Supp. 900, 911 (W.D.Ark.1974); *Southern Bell Telephone & Telegraph Co. v. Donnelly*, 35 F.Supp. 425, 429 (S.D.Fla.1940). Where, as here, liability has been determined adversely to the infringer, there has been a history of continuing infringement and a significant threat of future infringement remains, it would be inequitable to grant the copyright owner partial summary judgment on the issue of liability without enjoining the infringement of future registered works. Otherwise, HBO would be required to bring a separate infringement action every time it registers a new copyrighted work to be included in its subscription service, and the court, having already determined liability adversely to HBO, would be required to issue an injunction each such time. Under these circumstances, the court determines that it is well within its equitable powers to enjoin infringement of future registered works.

Orth-O-Vision also contends that HBO, by participating in an unlawful conspiracy to drive Orth-O-Vision out of business, has "unclean hands" and is undeserving of equitable relief.[14] As a general rule, it is no defense to a copyright infringement claim that the copyright owner is violating the antitrust laws. *United Artists Associated, Inc. v. NWL Corp.*, 198 F.Supp. 953, 957 (S.D.N.Y.1961); 3 M. Nimmer, *supra*, § 13.09[A] at 13–94. In a series of cases involving alleged infringement of patents, however, the Supreme Court has held that where the patentee is using his legal monopoly over the patented article to acquire economic control over unpatented articles, a court of equity may decline to protect his invention against infringement by means of an injunction. *See, e. g., Mercoid Corp. v. Mid-Continent Investment Co.*, 320 U.S. 680, 64 S.Ct. 268, 88 L.Ed. 376 (1944); *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). The Supreme Court has since recognized that copyright owners may sometimes enjoy analogous market dominance over their copyrighted articles enabling them to exert anticompetitive pressure in non-copyrighted articles, *United States v. Loew's, Inc.*, 371 U.S. 38, 45, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), but has not expressly held that a court of equity ought to decline to enjoin infringement where the copyright owner is engaged in such anticompetitive activity. Even if the rationale of *Mercoid* and *Morton Salt* were extended to copyrights, Orth-O-Vision has failed to establish its antitrust defense because there is simply no nexus between HBO's alleged anti-competitive actions and its power over copyrighted material. Unlike the patentees in *Mercoid* and *Morton Salt*, HBO is not alleged to have used its legal monopoly over copyrighted material to exert anti-competitive power over non-copyrighted material or to have otherwise used its copyrights to extend legal monopolies beyond their proper scopes. *See Alfred Bell & Co. v. Catalda Fine Arts, Ltd.*, 191 F.2d 99, 105–06 (2d Cir. 1951); *Greenbie v. Noble*, 151 F.Supp. 45, 61–62 (S.D.N.Y.1957).

Orth-O-Vision's final claim is that HBO's motion for injunctive relief, representing the culmination of a conspiracy to drive Orth-O-Vision out of business is itself violative of the antitrust laws. Notwithstanding Orth-O-Vision's characterization of HBO's conduct, a party's assertion of non-frivolous legal positions before courts

---

**14.** Orth-O-Vision also argues that an injunction ought not issue because only a small percentage of HBO's transmissions consist of material copyrighted by HBO. When the infringing portion of a defendant's work may be removed from the remainder, injunctive relief ought ex-

tend only to the former. 3 M. Nimmer, *supra*, § 14.06[B], at 14–50; *see Breffort v. I Had a Ball*, 271 F.Supp. 623, 625 (S.D.N.Y.1967). But when, as here, it is technologically impossible to separate out the infringing material the copyright owner ought not go unprotected.

or other adjudicatory bodies does not violate the antitrust laws even if there are anti-competitive motives for doing so. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.*, 497 F.2d 285, 290–91 (10th Cir. 1974). Thus, HBO's good faith effort to enforce its copyrights cannot be said to contravene the antitrust laws. *See Alberto-Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705, 711 (7th Cir. 1972).

### Conclusion

HBO's motion for partial summary judgment is granted. The court determines that HBO is entitled to a permanent injunction against Orth-O-Vision's infringement of all of HBO's present and future copyrighted works.

Settle decree on five days' notice.