### LITTLE, BROWN AND COMPANY (INC.)

v.

### AMERICAN PAPER RECYCLING CORP.

Civ. A. No. 90–13003–Y.

United States District Court, D. Massachusetts.

June 9, 1993.

12

Craig E. Stewart, Zick Rubin, Harvey Nosowitz, Palmer & Dodge, Boston, MA, for plaintiff.

David J. Apfel, Henry C. Dinger, Goodwin, Proctor & Hoar, Floyd H. Anderson, Goldstein, Burkin, Wennett & Carter, John J. Barter, Boston, MA, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON LIABILITY

COLLINGS, United States Magistrate Judge.

#### I. INTRODUCTION

After a pre-trial conference, counsel for the parties, plaintiff Little, Brown and Com-

pany, (Inc.) (hereinafter "Little, Brown") and defendant American Paper Recycling Corp. (hereinafter "APR") agreed that since there appeared to be no dispute on the underlying facts, the plaintiff's breach of contract and copyright infringement claims would best be addressed by bifurcating the questions of liability and damages. The parties have agreed that the liability issues on the claims of copyright infringement and breach of contract would be decided by the Court based upon a joint stipulation of facts,[1] and that, should the defendant be determined to be liable, the question of damages would be tried to a jury.[2]

Counsel have filed a document entitled Joint Stipulation for Purposes of Determining Liability (# 87). In addition, briefs on the liability issues have been submitted (## 91, 93, 95). After oral argument on May 26, 1993, the liability issues are ripe for resolution.

## II. THE UNDISPUTED FACTS

According to the joint stipulation, the facts of this case are as follows. Little, Brown is a publishing company with a principal place of business in Massachusetts. APR, an Illinois corporation with a principal place of business in Illinois, maintains an office and does business in Mansfield, Massachusetts.

Little, Brown and APR had an arrangement whereby APR would pick up books from Little, Brown for purposes of recycling said books. After the books were destroyed, APR paid Little, Brown ten dollars ($10.00) per ton for the usable weight of each shipment which was determined by weighing the paper after the books had been debound, i.e., once the book covers and bindings had been removed. The parties understood that, upon a request from Little, Brown, APR was required to provide a certificate of destruction with respect to any shipment, confirming that in fact the books in that shipment had been destroyed.

The parties have stipulated that on occasion APR provided certificates of destruction to Little, Brown with respect to books received by APR. The documentary evidence reveals that on March 15, 1985, April 8, 1985, April 12, 1985 and April 30, 1985, the vice-president of United Paper and Metal Company, Inc. certified to Little, Brown and APR that all the books in the shipments that it had received from Little, Brown on March 11, 1985, April 8, 1985, April 12, 1985 and April 30, 1985 respectively had been rendered unusable. It appears that these certificates of destruction were forwarded to Little, Brown by Helena L. Urban, the office manager at APR. Little, Brown admits that it received these certificates of destruction printed on United Paper and Metal Company, Inc. stationery on or about the dates on which they were issued.

By letters dated April 1, 1987 and February 22, 1988, the vice-president of Pulp Recycling Northeast Corporation certified to Little, Brown and APR that all the books received in eight specified shipments had been rendered unusable. Little, Brown has stipulated that it received these certificates of destruction on or about the dates on which they were issued. A business record maintained by Little, Brown reflects that on June 28, 1988, sixteen thousand fourteen books (16,014) were shipped by Little, Brown to APR "c/o Pulp Recycle, South Glen Falls, New York, 'per Helena.'"

On October 5, 1989, the plant manager at APR certified to Little, Brown that one skid of books had been cut and destroyed at the APR recycling facility in Mansfield, Massachusetts. Another certificate of destruction, this one dated October 17, 1989, was provided to Little, Brown by the APR plant manager at the Mansfield facility.

In response to a request from Little, Brown, on July 2, 1990 APR forwarded a certified destruction report regarding books shipped on June 14, 1990. This certificate of

---

1. With the parties' consent, this case has been referred to the undersigned United States Magistrate Judge for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

2. Count IV states a claim under M.G.L.A. Chapter 93A. The trial of this claim, both as to liability and damages, is for the Court. The Court's disposition of the 93A claim will be discussed, *infra,* at p. 17.

destruction had been faxed to APR from NBD Corp., confirming that the Little, Brown books had been destroyed at the NBD plant in Weber City, Virginia. Upon receipt from NBD, APR, which had an ownership interest in the NBD debinding facility, provided the certified destruction report to Little, Brown. On August 15, 1990, a certificate on APR letterhead was provided to Little, Brown regarding a shipment received by APR on July 9, 1990 that confirmed the books "were cut and destroyed at our Book De–Binding facility in Weber City, VA." At some point in August, 1990, APR sold its interest in NBD Corp. and discontinued using the NBD Corp. debinding facility.

This history of the transactions between the parties from 1985 through July, 1990 is not the basis of any asserted liability; rather, it illustrates the manner in which the parties dealt with each other during the period.

The instant litigation concerns books which APR picked up books from Little, Brown on or about October 31, 1990, November 6, 1990, November 7, 1990 and November 14, 1990. Among the books consigned to APR by Little, Brown on these dates were copies of the novels *Vineland* and *Masquerade* which were published by Little, Brown with notices of copyright on their title pages and which were registered with the copyright office. Little, Brown was assigned each copyright holder's exclusive right to distribute those works to the public. APR did not destroy these four shipments of books; rather, it sold them to Advantage Paper Stock, Inc./Viking Fibres, Inc. (hereafter "Advantage"). Prior to October of 1990, APR had never before used Advantage to process books.

Advantage faxed a purchase confirmation to APR on or about October 29, 1990, therein agreeing to buy "books for cutting" at a price of thirty dollars ($30.00) per ton. APR did in fact receive thirty dollars ($30.00) per ton from Advantage for the sale of the four shipments of Little, Brown books. There is no evidence that Little, Brown knew at any time prior to the initiation of this lawsuit that APR intended to sell or had sold to Advantage any books consigned to APR by Little, Brown, or that APR had shipped any such books to Advantage.

Rather than destroying the Little, Brown books, Advantage sold them to Perkins Recycling Corp. (hereinafter "Perkins") for a price of forty dollars ($40.00) per ton. In turn, Perkins sold two truckloads of the Little, Brown books to Diversified Business Enterprises, Inc. (hereinafter "Diversified") for two hundred forty dollars ($240.00) per ton. NBE West, Inc. acquired some of the Little, Brown books sold to Diversified and thereafter resold some of them to other entities including Sea Span Publications, Inc. and New England Mobile Book Fair, Inc.

The parties have stipulated there is no evidence that APR knew that Advantage had sold the Little, Brown books to Perkins, or that any entity or entities had come into possession of the books prior to receiving notice of the instant lawsuit from counsel for Little, Brown. Further, there is no evidence that APR participated in the activities of any entity or entities that came into possession of the Little, Brown books after APR sold them to Advantage. Finally, the parties agree that Little, Brown never expressly authorized APR's sale of Little, Brown books to other recyclers for the purpose of recycling and, on the other hand, never expressly restricted APR's sale of Little, Brown books to other recyclers for the purpose of recycling.

## III. LEGAL ANALYSIS

There is no written contract incorporating the terms of the parties' agreement. Little, Brown takes the position that it did not sell the books to APR but rather sold the usable weight of paper remaining after the covers and bindings of the books had been removed. The plaintiff characterizes the arrangement between itself and APR as a contract for services, i.e., recycling, with the parties in a bailor/bailee relationship. APR, as the bailee, was responsible for destroying the books. After discharge of the duty to destroy, the contract price based on the remaining usable weight of paper was established and the sale of the paper consummated. Little, Brown argues that APR's sale of the books to Advantage constituted a breach of the bailment contract.

APR, conversely, avers that pursuant to their arrangement, Little, Brown sold the books to APR with the restriction that they be recycled. In APR's view, the provisions of the Uniform Commercial Code are applicable to this transaction such that upon delivery of the books by Little, Brown to APR, title to the books passed to the defendant. *See* M.G.L.A. ch. 106 §§ 2–106(1) and 2–401(2). APR argues that it was entitled to sell the books to Advantage. Moreover, having sold the books to Advantage under the specific terms "for cutting", APR contends that it complied with the terms of its contract with Little, Brown and, consequently, cannot be held liable for the actions of any other entities that later come into possession of the books.

Turning first to an examination of the precise words of the joint stipulation, the parties agree that:

> APR had an arrangement with Little, Brown whereby it would pick up books from Little, Brown for purposes of recycling said books. After the books were destroyed, APR paid Little, Brown $10.00 per ton for the usable weight of the shipment. The usable weight consisted of the weight of the paper once the books covers and bindings had been removed.

Joint Stipulation # 87, ¶¶ 5 and 6.

Thus, it is undisputed that APR paid Little, Brown not for the value of the books as books, or for books with the restriction to recycle, but rather for the usable weight of each shipment after the books were destroyed. Indeed, the contract price could not be ascertained until after certain services had been rendered, i.e., once the book covers and bindings had been removed. It has also been stipulated that the shipments of books that APR sold to Advantage had been "*consigned* to APR by Little, Brown." Joint Stipulation # 87, ¶¶ 16, 17 (emphasis added). This language, "consigned to American Paper Recycle", is present on each of the bills of lading accompanying the four shipments of books from Little, Brown which APR sold to Advantage.

██ These stipulated facts are more indicative of a bailment for mutual benefit than they are of an outright sale of the books. By definition, a bailment is:

> ... the delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it. (footnotes omitted)

*Omni–Wave Electronics Corporation v. Marshall Industries*, 127 F.R.D. 644, 650 (D.Mass.1989) (citations omitted).

The arrangement between Little, Brown and APR appears to fall squarely within the quoted description. This interpretation is buttressed by other considerations.

The relationship between the parties is further defined in the joint stipulation in that "[b]oth APR and Little, Brown understood that, with respect to any shipment, Little, Brown could require APR to provide a certificate of destruction confirming that the books had been destroyed." Joint Stipulation # 87, ¶ 7. The argument that Little, Brown sold the books, albeit with a restriction, to APR and that APR was entitled to sell them to Advantage falls flat in light of this additional contractual requirement as is perhaps best evidenced by the circumstances of this case. APR quite simply could not, if requested, provide Little, Brown with a certificate of destruction for the subject four shipments of books because at least some of those books were not rendered unusable.

██ APR conceded during oral argument that the duty to provide a certificate of destruction was nondelegable. There is a distinction to be made between the duty to provide the certificate of destruction and the duty actually to destroy. APR argues that having received certificates of destruction from entities other than APR, Little, Brown was on notice that APR had previously sold books consigned to it by Little, Brown. None of these certificates of destruction reflect a sale of books by APR to the certifying entity. Thus, it is equally plausible to infer from these documents that APR had delegated its responsibility to recycle the subject books. Such a delegation is perfectly consistent with a bailment. *See, e.g.,* 8 *Corpus*

*Juris Secundum*, Bailments § 34 at p. 263–264 (1988). While a bailee properly may delegate to another the performance of the services required with respect to the bailed property, the bailee remains accountable to the bailor to demonstrate that the specific purpose of the trust was faithfully executed. *See*, e.g., 8 *Am.Jur.2d*, Bailments § 132 at pp. 860–861 (1980).

During oral argument and in a subsequent letter, APR argued that section 2–403 of the Uniform Commercial Code applies to this case and "defines the parties' rights." In pertinent part, this code section provides:

> (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

> (3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

M.G.L.A. ch. 106 § 2–403(2) and (3).

By its terms, this section applies to a bailment, delineating the rights as between a bailor, a bailee and a third party bona fide purchaser. *See*, e.g., James L. Padgett, *Uniform Commercial Code, Section 2–403(2): The Authority of a Bailee to Convey Title*, 21 U.Fla.L.R. 241 (1968). Assuming, arguendo, that section 2–403 is applicable, properly construed it means that APR, the entity to whom goods were entrusted, had the power to transfer all rights of Little, Brown, the entruster, to Advantage, the buyer in the ordinary course of business. While this section may define the rights of Advantage as against Little, Brown, it clearly does not enhance APR's rights vis-a-vis the plaintiff. In other words, while APR may have been able to transfer Little, Brown's title to the four shipments of books to Advantage, section 2–403 plainly would not vest title or ownership rights in APR.

## IV. CONCLUSIONS OF LAW

■ Based upon the stipulated facts and documentary evidence, as well as the reasonable inferences to be drawn therefrom, I find that the arrangement between Little, Brown and APR pursuant to which APR would pick up books from Little, Brown for purposes of recycling was not a contract for the sale of books, but rather a contract for services. I reach this conclusion based upon the facts that first, the parties agree that the books were consigned by Little, Brown to APR; second, APR paid Little, Brown for paper, not books; third, the contract price for the paper could not be determined until after the services had been rendered, i.e., once the book covers and bindings were removed; and fourth, APR was contractually required upon request to certify that the services had been performed, i.e., that the books had been destroyed.

The Massachusetts Supreme Judicial Court has held that "[c]ontracts whose predominant factor, thrust or purpose is the rendition of services are not within the scope of art. 2 (U.C.C.)" (citation omitted). *White v. Peabody Construction Co., Inc.*, 386 Mass. 121, 132, 434 N.E.2d 1015, 1021 (1982); *Accord, Cumberland Farms v. Drehmann Paving*, 25 Mass.App.Ct. 530, 534, 520 N.E.2d 1321, 1324 (1988). I find that the arrangement between Little, Brown and APR, as a contract for services, was not a transaction for the sale of goods, specifically books, within the meaning of the Uniform Commercial Code. Consequently, title did not pass from Little, Brown to APR upon physical delivery of the books to APR under either M.G.L.A. ch. 106 § 2–106(1) or § 2–401(2). Further, application of M.G.L.A. ch. 106 § 2–403 to the sale of books by APR to Advantage does not serve to vest title or ownership rights to the four shipments in APR as against Little, Brown.

■ Based on all the facts and circumstances, I find that from the time APR picked up the books at Little, Brown until such time that the sale of the paper after destruction of the books was consummated, APR had possession of the books as a bailee, it being "... universally agreed that a bailment for hire, or for mutual benefit, arises

when a chattel is delivered by its owner to another for repairs, service, or alteration." *See,* e.g., 8 *Am.Jur.2d,* Bailments § 21 at p. 753 (citations omitted). In this instance, APR took possession of the books in order to recycle them. Delegation of the duty to destroy is not inconsistent with a bailment in that the personal skill of APR was not necessary to perform the services. 8 *Corpus Juris Secundum,* Bailments, § 34 at p. 264, § 35 at p. 267. Others could, and in fact did, render Little, Brown books unusable. However, the fact that APR was ultimately responsible to Little, Brown for the purposes of the bailment, i.e., debinding the books, is underscored by the parties' understanding that, upon request, APR was required to provide certificates of destruction.

The law is clear that:

On creation of the ordinary bailment, the general property remains in the bailor, and the bailee has only a special interest for the express or implied objects of the bailment. Where one with legal title to property becomes the bailor thereof, the contract of bailment does not contemplate any change in that title, and it remains in the bailor.

8 *Am.Jur.2d,* Bailments § 78 at p. 815; 8 *Corpus Juris Secundum,* Bailments § 28 at p. 252.

In the present case, Little, Brown as the bailor of the books retained ownership of and title to the books; APR, as the bailee, had the right to possession.

 I conclude that in selling the four shipments of books to Advantage, APR breached its contract with Little, Brown.

It is undisputed that copies of two novels, *Vineland* and *Masquerade,* were among the books consigned by Little, Brown to APR, and thereafter sold by APR to Advantage. These novels were published by Little, Brown with notices of copyright on their title pages and were registered with the copyright office. Little, Brown was assigned the author/copyright holder's exclusive right to distribute *Vineland* and *Masquerade* to the public.

I find that APR did not obtain title to or ownership interest in the books pursuant to its contract with Little, Brown. I further find that Little, Brown did not authorize, either expressly or impliedly, the sale of the four shipments of books by APR to Advantage.

I conclude that in selling the four shipments of books to Advantage, APR infringed Little, Brown's rights under the Copyright Act, to wit, the exclusive right "to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership." *See,* 17 U.S.C. § 106(3); 17 U.S.C. § 501(a); *Sony Corporation of American v. Universal City Studios, Inc.,* 464 U.S. 417, 432–433, 104 S.Ct. 774, 784, 78 L.Ed.2d 574 (1983); *Samet & Wells, Inc. v. Shalom Toy Co., Inc.,* 429 F.Supp. 895, 900 (E.D.N.Y. 1977), aff'd, 578 F.2d 1369 (2 Cir.1978).

## V. THE 93A CLAIM

 Leaving aside the question of whether the 93A claim as contained in Count IV of the Amended Complaint (# 46) is preempted by the federal copyright law, I find that on the record before me, the defendant's actions amounted to no more than a garden-variety breach of contract. Put another way, I do not find that the defendant's actions in this case "... attain a level of rascality" which would support a finding of liability under Chapter 93A. *Williams v. Arndt,* 626 F.Supp. 571, 581 (D.Mass., 1985) quoting *Levings v. Forbes & Wallace, Inc.,* 8 Mass. App.Ct. 498, 504, 396 N.E.2d 149, 153 (1979).

## VI. SUMMARY

In sum, APR is liable to Little, Brown on Counts I and III and not liable to Little, Brown on Count IV of the Amended Complaint (# 46).[3]

---

**3.** Plaintiff's counsel has informed the Clerk, upon telephonic inquiry by the Clerk, that the plaintiff

is waiving the claims contained in Count II and Count V.